**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

No. 96-20218

RAMON MATA, JR.,

Petitioner-Appellant,

versus

GARY JOHNSON, Director,
TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, INSTITUTIONAL DIVISION,

Respondent-Appellee.

Appeal from the United States District Court
For the Southern District of Texas

October 31, 1996

Before WIENER, PARKER, and DENNIS, Circuit Judges.

WIENER, Circuit Judge:

Petitioner-Appellant Ramon Mata, Jr., a Texas death row inmate, appeals the district court's grant of summary judgment in favor of Respondent-Appellee Gary Johnson, Director of the Texas Department of Criminal Justice (the Director), denying and dismissing with prejudice Mata's petition for a writ of habeas corpus. For the reasons set forth below, we affirm the judgment of the district court.

FACTS AND PROCEEDINGS

In February 1986, Mata was convicted of capital murder and sentenced to death for the murder of Minnie Rene Houston, a black female prison guard in the Ellis Unit of the Texas Department of Corrections in Walker County, Texas.  At the time of the killing, Mata was already serving a prison sentence at the Ellis Unit for a previous murder.  Mata and six other trustee inmates worked under Officer Houston's supervision at the corrections officers' dining hall.  Evidence in the trial record suggests that Mata and Houston may have been romantically involved.

On the night of the killing, Officer Houston issued filet knives to the inmates so that they could clean fish.  About 9:30 that evening, Mata used his knife to stab Houston to death.  He then ran from the kitchen, took Houston's car, drove across a field to the main picket tower, got out of the car, and told an officer that he had killed Houston.  The knife, with Mata's fingerprints on it, was found on the floor of Houston's car between the seat and the door on the driver's side.  Blood of Houston's type was found on Mata's clothes, Houston's clothes, and the knife.

Mata, who is Hispanic, was charged with capital murder under Texas Penal Code § 19.03(a)(5).  Under that provision, it is a capital offense for a person, while incarcerated in a penal institution, to murder another who is employed in the operation of the penal institution.

The case commanded widespread attention in Walker County,

where over twenty percent of the adult residents were affiliated with the prison. The trial judge conducted a poll and determined that nearly everyone in the county was familiar with the case, and that more than half had already formed an opinion about Mata. On the basis of that information and pursuant to his own motion, the trial judge changed the venue of the case to neighboring Madison County. Although approximately seventeen percent of the adult residents of Madison County also were affiliated with the prison, Mata did not request another change of venue.

Seventy-six persons answered the summons for jury duty in Mata's trial, and eight members of the venire were black. During jury selection, however, the prosecution and Mata's defense counsel agreed to exclude all eight black venirepersons from the jury. The trial court permitted this to happen without requesting a non-discriminatory explanation or even requiring the parties to expend a single peremptory challenge.

Courtroom security was enhanced for Mata's trial. Heavily armed, specialized security forces were stationed throughout the courtroom, and video cameras and metal detectors were installed in the entryway. In addition, between thirty and forty fully uniformed prison guards were in regular attendance as spectators throughout the proceedings.

In the separate punishment phase of the trial that followed Mata's conviction, the jury answered "yes" to the three questions posed to them pursuant to Texas Code of Criminal Procedure art. 37.071(b), and the trial court sentenced Mata to death. The Texas

3

Court of Criminal Appeals affirmed the conviction and sentence[1] and subsequently denied Mata's motion for rehearing. Mata did not petition the Supreme Court for a writ of certiorari. Thus, Mata's conviction became final on November 4, 1992.

Mata filed a state habeas corpus petition in 1993, which he supplemented in 1994. On January 6, 1995, the trial court adopted the appointed Master's Final Report which concluded that Mata's claims did not entitle him to relief, and the Texas Court of Criminal Appeals denied habeas relief on January 27.[2] The U.S. Supreme Court denied writs on October 10, 1995.[3]

Mata filed his federal habeas petition on September 18, 1995. The next day, the trial court scheduled Mata's execution for March 14, 1996. On March 5, the district court denied Mata's habeas petition and Application for Certificate of Probable Cause.[4] Mata promptly filed a Notice of Appeal to this court. Noting that the district court had waited to deny Mata's petition until less than 10 days before his scheduled execution, we stayed Mata's execution and carried his Application for Certificate of Probable Cause (CPC) with this appeal.

Mata asserts three claims in his habeas petition: (1) that

---

[1] Mata v. State, No. 69,632 (Tex. Crim. App. Nov. 4, 1992)(unpublished).

[2] Ex parte Mata, Writ No. 8,937-02 (Tex. Crim. App. Jan. 27, 1995)(unpublished).

[3] Mata v. Texas, 116 S.Ct. 297, 133 L.Ed.2d 204 (1995).

[4] Mata v. Scott, No. H-95-4545 (S.D. Tex. March 5, 1996) (unpublished).

the agreement between his own defense counsel and the prosecution to exclude all blacks from the jury violated the Equal Protection Clause of the Fourteenth Amendment, (2) that this agreement deprived him of his Sixth Amendment right to a jury chosen from a fair cross-section of the community, and (3) that his Sixth and Fourteenth Amendment rights to a fair trial were denied through a combination of harmful circumstances surrounding the trial, including the presence of armed guards throughout the courtroom, the addition of special video cameras and metal detectors for the duration of the trial, prejudicial pretrial publicity, and the constant and overbearing presence of uniformed correctional officers in the spectator portion of the courtroom.

We construe Mata's request for a CPC as a request for the newly required Certificate of Appealability (COA), grant Mata's request for a COA, and proceed to the merits of his appeal.

II

ANALYSIS

A.   ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT OF 1996

Our jurisdiction to employ the writ of habeas corpus to review the constitutionality of Mata's state court conviction and sentence is derived from 28 U.S.C. §§ 2241-2255. The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), signed into law on April 24, 1996, revised that statutory scheme in two ways relevant to Mata's case: (1) The Amended Standard Procedures (AEDPA §§ 101-106, codified at 28 U.S.C. §§ 2241-2255) are applicable to all federal habeas petitions; and (2) the Expedited Procedures (AEDPA

5

§ 107, codified at 28 U.S.C. §§ 2261-2266) are applicable only to capital cases. As an initial matter, we must determine whether either or both of these new AEDPA provisions govern the case now before us.

1. The Amended Standard Procedures

Although the AEDPA specifically provides that the expedited procedures in § 2264 are immediately applicable when a state fulfills the "opt-in" requirements, the Act is silent concerning the effective date of the amended standard procedures in § 2254.[5] Recently, in Drinkard v. Johnson,[6] another panel of this court held that the amendment to § 2254(d)(1) concerning the appropriate standard of review applicable to federal courts considering habeas corpus proceedings arising out of state convictions is procedural in nature and therefore immediately applicable under the Landgraf v. USI Film Products[7] analytic framework. We see no basis for divorcing the remainder of the § 2254 amendments -- all of which involve standards of review --  from the Drinkard application of Landgraf. We hold that the entire amended § 2254 applies to the issues raised by Mata in this case.

---

[5]   The expedited procedures in § 2264 expressly require application of § 2254(a),(d)&(e). Therefore, if the state qualifies as an opt-in state, the immediate applicability of § 2264 includes the amended standard provisions. However, because we determine that Texas is not an opt in state, the immediate applicability of § 2264 does not inform this question.

[6]   Drinkard v. Johnson, --F.3d--, 1996 WL 571122 (5th Cir. October 7, 1996).

[7]   511 U.S. 244, 114 S. Ct. 1483, 128 L. Ed. 2d 229 (1994).

2. The Expedited Procedures

Section 107 of AEDPA, entitled "Death Penalty Litigation Procedures," expressly provides that the Expedited Procedures codified in 28 U.S.C. § 2262-2266 are immediately applicable to pending petitions brought by death row prisoners held in state custody.[8]  Application of these new procedures, however, is conditioned on the State establishing:

> [by] statute, rule of its court of last resort or by another agency authorized by State law, a mechanism for the appointment, compensation and payment of reasonable litigation expenses of competent counsel in state post-convictions proceedings by indigent prisoners. . . . The rule of court or statute must provide standards of competency for the appointment of such counsel.[9]

A state may opt in to the expedited procedures by fulfilling these requirements.  Even prior to the enactment of AEDPA, Texas had established a statewide mechanism for the appointment of counsel to represent its burgeoning death row population in post-conviction proceedings.[10]

a. Attorney's fees and costs

The AEDPA requires a qualifying state to have established "a mechanism for the . . . compensation and payment of reasonable litigation expenses of competent counsel."[11]  The Texas Court of Criminal Appeals has adopted strict guidelines limiting

---

[8]  28 U.S.C. § 2266(c).

[9]  28 U.S.C. § 2261(b).

[10]  Act of May 24, 1995, Ch. 319, § 1, 1995 Tex. Sess. Law Serv. 2764 (Vernon) (effective Sept. 1, 1995) (codified as Tex. Code Crim. Proc. Ann. art. 11.071).

[11]  28 U.S.C. § 2261(b).

7

compensation to $7,500 and reimbursement of expenses to $2,500 for each appointment made under art. 11.071. Mata contends that these rates are inadequate to ensure the ability of death row inmates to obtain competent counsel to represent them in state habeas proceedings, urging that Texas is therefore disqualified as an opt-in state. In other words, Mata contends that $7,500/$2,500 will not pay the "compensation and reasonable litigation expenses of competent counsel."

We do not find the limits facially inadequate, and Mata has not established any circumstances that would prove the limits inadequate in his case.

b. Standards for ensuring competency of counsel

Mata next argues that Texas has not satisfied the requirement set out in 28 U.S.C. § 2261(b) that, to qualify as an opt-in state, the mechanism for appointment of counsel must include "standards of competency" for such counsel. Art. 11.071 does not provide standards of competency in the statute itself. Although art. 11.071, § 2(d) states that standards of competency will be adopted by the Texas Court of Criminal Appeals,[12] to date no such standards have been adopted.

The State argues that the Texas Court of Criminal Appeals has implemented a flexible mechanism for evaluating the qualifications

---

[12] Art. 11.071 § 2(d) provides, in pertinent part:

Unless an applicant elects to proceed pro se or is represented by retained counsel, the court of criminal appeals shall, under rules and standards adopted by the court, appoint competent counsel at the earliest practicable time.

8

of prospective counsel:  Each counsel seeking appointment in a capital case must complete and submit a questionnaire, which the Court of Criminal Appeals evaluates on a case-by-case basis to ensure competence.  But we interpret § 2261(b) to require explicit standards of competency.  The Texas statute, on its face, delegates the task of developing competency standards to Texas's highest criminal court.  Under § 2265(a), such delegation is appropriate; so far, however, the Texas Court of Criminal Appeals has failed to fulfill its delegated task.  Moreover, Texas has failed to comply fully with § 2265's requirements, as it has not "establishe[d] by statute, rule of court of last resort, or by another agency authorized by State law" specific, mandatory standards for capital habeas counsel.  Therefore, we conclude that Texas is not yet eligible to take advantage of the provisions afforded opt-in states under the AEDPA.[13]

## B.  STANDARD OF REVIEW

Having determined that the amended standards of review in § 2254 apply to Mata's case, we must next decide what those new standards require of us.  We begin by examining the amended language of the statute.

> (d) A [§ 2254 writ] shall not be granted . . . unless the adjudication of the claim

---

[13]  See Ashmus v. Calderon, 935 F.Supp. 1048 (N.D.Cal. 1996)(California's statute does not include adequate competency standards to qualify as an opt-in state); Austin v. Bell, 927 F.Supp. 1058 (M.D.Tenn. 1996) (Tennessee's statute does not include adequate competency standards to qualify as an opt-in state); Hill v. Butterworth, 1996 WL 447194 (N.D.Fla. August 9, 1996)(Florida's statute does not include adequate competency standards to qualify as an opt-in state).

> (1)  resulted in a decision that was contrary to,
>      or involved an unreasonable application of,
>      clearly established Federal law, as determined
>      by the Supreme Court of the United States; or
> (2)  resulted in a decision that was based on an
>      unreasonable determination of the facts in
>      light of the evidence presented in the State
>      court proceeding.

The Drinkard majority interprets the second clause of (d)(1), which sets out the standard of review for mixed questions of fact and law, thus:

> [W]e hold that an application of law to facts is unreasonable only when it can be said that reasonable jurists considering the question would be of one view that the state court ruling was incorrect. In other words, we can grant habeas relief only if a state court decision is so clearly incorrect that it would not be debatable among reasonable jurists.[14]

The Drinkard dissent, while agreeing that (d)(1) is immediately applicable, characterizes the standard of review as de novo.[15] We understand the Drinkard majority to articulate a somewhat hybrid standard of review that is probably most closely akin to the traditional "clearly erroneous" standard than to any other established standard of review.

The concept of federal habeas courts applying a "reasonableness" inquiry to state court decisions did not spring full grown, in all its Athenian beauty, from the AEDPA's forehead. During what has been called the heyday of habeas review, the Warren Court allowed habeas claims based on law not in existence at the time of the petitioner's trial, denominating the "adequate state-

---

[14]  Drinkard, 1996 WL 571122, *15 (emphasis added).

[15]  Id. at *27.

10

ground rule a function of <u>appellate</u> review."[16]  Less than ten years later, however, the Supreme Court developed the cause and prejudice requirement.  That is, a petitioner was required to show (1) cause for his failure to comply with procedural rules and (2) actual prejudice resulting from the federal violation claimed.[17]  In 1977, <u>Wainwright v. Sykes</u>[18] extended the "cause and prejudice" test of <u>Davis</u> and <u>Francis</u> to state contemporaneous objection rules, calling into question <u>Fay v. Noia</u>'s view of the adequate and independent state ground doctrine.  This trend of narrowing the federal habeas review culminated in <u>Teague v. Lane</u>,[19] which held that new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced.  Justice Scalia explained the new view of the role of federal habeas review in 1989:

> [T]he historic role of habeas corpus in our system of law [ ] is to provide a deterrence, the threat of which serves as a necessary additional incentive for trial and appellate courts throughout the land to conduct their proceedings in a manner consistent with established constitutional standards.  Deterrence and threat are meaningless concepts as applied to a situation in which the law is so uncertain that a judge acting in all good faith and with the greatest of care could reasonably read our precedents as permitting the result the habeas

---

[16]  <u>Fay v. Noia</u>, 372 U.S. 391, 429, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963)(emphasis in original).

[17]  <u>Davis v. United States</u>, 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973); <u>Francis v. Henderson</u>, 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976).

[18]  433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

[19]  489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).

11

petitioner contends is wrong.[20]

In effect, a reasonable, good faith application of Supreme Court precedent will immunize the state court conviction from federal habeas reversal, even if federal courts later reject that view of the applicable precedent. The AEDPA essentially codified the Supreme Court's current position on the scope of the Great Writ. We must therefore ask, under § 2254(d)(1), whether a state judge could reasonably read Supreme Court precedent as permitting the result of which Mata now complains.

C.   THE EQUAL PROTECTION CLAIM

1.   <u>The state's decision was clearly erroneous</u>

We are convinced beyond peradventure that no reasonable state judge could read Supreme Court precedent as permitting the agreement that was reached and implemented in this case. The prosecution and the defense counsel explicitly agreed to exclude all eight black venire members from the jury, and the trial judge approved the agreement, at least implicitly, by permitting the parties to strike each and every black without articulating a reason or even expending any of their allotted peremptory challenges. Unquestionably, such collusion among the prosecution, the defense, and the judge constitutes a flagrant violation of the Equal Protection clause of the Fourteenth Amendment, as set forth by the Supreme Court in an unwavering line of cases dating back more than a century.

---

[20] <u>Penry v. Lynaugh</u>, 492 U.S. 302, 350, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989)(Scalia, J., concurring in part, dissenting in part)(quotations and citations omitted).

12

Over one hundred years ago, in a series of cases beginning with Strauder v. West Virginia,[21] the Supreme Court enunciated the "constitutional imperative of race neutrality in the courtroom."[22] In Strauder, the Supreme Court "recognized that denying a person participation in jury service on account of his race unconstitutionally discriminates against the excluded juror."[23] Since that time, the Court has never waivered on the principles announced in Strauder. "Rather, the Court has been called upon repeatedly to review the application of those principles to particular facts."[24]

Of course, the state appellate courts should have gleaned guidance from more recent Supreme Court precedent as well. Mata's conviction became final in November 1992, long after the Court issued its opinions in Batson v. Kentucky[25] and Powers v. Ohio,[26] and six months after the Court's opinion in Georgia v. McCollum.[27] In Batson and its progeny, the Supreme Court focused primarily on proscribing the use of peremptory challenges to exclude jurors on

---

[21]   100 U.S. 303 (1880).

[22]   Powers v. Ohio, 499 U.S. 400, 402, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).

[23]   Georgia v. McCollum, 505 U.S. 42, 48, 112 S.Ct. 2348, 2353, 120 L.Ed.2d 33 (1992).

[24]   Batson v. Kentucky, 476 U.S. 79, 90, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

[25]   476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

[26]   499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).

[27]   505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992).

the basis of race.  Batson was designed not only to protect individual defendants from discrimination in the selection of jurors, but also to protect the rights of potential jurors and to ensure continued public confidence in the judicial system.  In Powers and McCollum, the Court noticeably shifted the focus further away from the injury to the litigants and toward the more expansive harm done to the excluded jurors and the community at large. Neither the prosecution nor the defense is permitted to use peremptories to exclude potential jurors on the basis of race,[28] and a litigant need not be of the same race as the excluded jurors to have standing to champion their rights.[29]  That the judge, the prosecution, and the defense are all state actors in the context of jury selection was settled law before Mata's conviction became final.[30]  Thus, it would be ludicrous to believe that state actors could avoid the constitutional infirmity of race-based peremptory strikes by mutual agreement.  Moreover, the constitutional violation in this case was more clear-cut than in the typical Batson-type situation because both the prosecution and the defense participated, as did the trial court, albeit on a slightly more passive level.

We conclude that any reasonable jurist — nay, every reasonable jurist — would have held that, whether it be at the hands of one, all, or some combination of, the three relevant state actors,

---

[28]  McCollum, 505 U.S. at 55, 112 S.Ct. at 2357.

[29]  Powers, 499 U.S. at 415.

[30]  McCollum, 505 U.S. at 54, 112 S.Ct. at 2356.

discrimination in the selection of jurors constitutes a violation of the jurors' right to equal protection under the law. "[R]ace neutrality in jury selection [is] a visible, and inevitable, measure of the judicial system's own commitment to the commands of the Constitution. The courts are under an affirmative duty to enforce the strong statutory and constitutional policies embodied in that prohibition."[31] We are duty bound to uphold the dignity of excluded jurors and to do all we can to sustain the respect and confidence of the people in the integrity and impartiality of our judicial system.

Our recent decision in United States v. Huey[32] bears significantly on Mata's petition, as our holding in that case is consistent with Supreme Court precedent. In Huey, we overturned the convictions of two co-defendants because one of them, over objections from the prosecution and the other co-defendant, used all of his peremptory challenges to strike black jurors. Holding that we were obligated to vacate the convictions of both co-defendants, we stated:

> We are not unaware that there is some irony in reversing Huey's conviction given that it was his counsel who made the discriminatory strikes. We are convinced, however, that this result is consistent with the teachings of Batson and its progeny. In addition to harming individual defendants and prospective jurors, racial discrimination in the selection of jurors impugns the integrity of the judicial system and the community at large. 'Be it at the hands of the State or the defense, if a court allows jurors to be excluded because of a group bias, it is a willing participant in a scheme that

---

[31] Powers, 499 U.S. at 416.

[32] 76 F.3d 638 (5th Cir. 1996).

15

could only undermine the very foundation of our system of justice--our citizens' confidence in it.'[33]

The Supreme Court has held repeatedly that the Constitution prohibits purposeful discrimination on the ground of race in the selection of jurors. Therefore, the state court's determination that the exclusion of black veniremembers from Mata's jury, by mutual agreement between the prosecution and the defense, passed constitutional muster was contrary to clearly established Supreme Court precedent.

That does not end our inquiry, however. The constitutional violation is clear, but Mata's petition states a unique claim in two central respects. First, we cannot apply the traditional Batson framework to Mata's claim because no objection was made at trial. Indeed, differing from the typical Batson situation, the instant discrimination was accomplished without either party expending a single peremptory strike. Second, and more importantly, Mata is demanding a new trial to remedy the effect of his own constitutional violation. This factor more than any other sets Mata's claim apart from those that we have encountered previously. Thus, as a threshhold inquiry, we must first determine whether Mata even has standing to raise this constitutional challenge on behalf of the excluded jurors, and, if so, whether the grant of a new trial is the only appropriate remedy, assuming that remedy is appropriate at all.

Standing here is a close issue. If we should conclude that

---

[33] Huey, 76 F.3d at 641 (quoting McCollum, 505 U.S. at 49-50, 112 S.Ct. at 2354).

16

the instant violation cannot be remedied through a grant of a new trial, then the issue of standing would become moot. Therefore, we assume arguendo that Mata has the requisite standing and proceed to answer the question whether this constitutional violation warrants the granting of a new trial.

2.    Competing Harms to the System

As earlier noted, Mata asserts that the unconstitutionality of the race-based agreement to exclude black veniremembers from the jury requires us to vacate his conviction and order a new trial. We do not find such a result to be so clear. First, we must constantly bear in mind precisely whose harm we are attempting to remedy. Mata does not suggest that we should concern ourselves with any injury, perceived or real, that might have befallen him as a result of the agreement. With that we agree: If the agreement violated Mata's constitutional rights, he waived those rights by colluding in the violation. Instead, we are concerned with the toll that the agreement took on the dignity of the excluded jurors and on the integrity of the judicial system. Regrettably, there is nothing we can do at this late date to remedy the injury to the particular veniremembers who a decade ago were excluded from Mata's jury. Our current concern, then, must be principally for the reputation and integrity of the system in general.

Viewed from that perspective, it does not necessarily follow that we should grant a new trial. The parties to this agreement, Mata included, have placed us in a "Catch 22" situation: Regardless of whether we do or do not grant a new trial, we will

17

risk doing violence to public confidence in the judicial system either way. On the one hand, if we should refuse to vacate Mata's conviction, we risk sending an unpalatable and unintended signal that we decline to do absolutely everything in our power to deter future acts of racial discrimination in the selection of jurors. On the other hand, if we should grant Mata a new trial, we may do even greater damage to the integrity of our judicial system; Mata would receive a benefit because of an error which he or his counsel invited, although Mata has never contended that he is innocent of the crime. Consequently, the core value of the image of justice would be impaired. By the phrase image of justice we do not mean that any judicial decision ought to be made on the basis of its likely impact upon the court's public relations in the Madison Avenue sense, but that it is important not only that courts dispense justice but that, insofar as possible, courts also appear to do so. We therefore resist the invitation to establish a per se rule that would have us throw out the verdict and try the case again whenever veniremembers have been excluded from a jury on the basis of race. Instead, any time that a defendant requests a new trial on the basis of his own constitutional violation, we shall consider the facts peculiar to that case, balance the competing harms to the system, and choose that course of action that we believe will do the least damage to the system and to the peoples' perception of it.

Our holding in Huey does not compel the granting of a new trial in this case. The factors in Huey that counseled against

18

granting a new trial were outweighed by our obligation to deter discriminatory jury selection practices. In Huey, though, there was no question but that the case had to be retried with respect to the co-defendant who had not acted in a discriminatory fashion. Thus, our decision to order a new trial for both co-defendants did not significantly increase the financial or emotional burden on the community. In contrast, the factors weighing against the imposition of a new trial for Mata are more pronounced. Mata was convicted in 1986 shortly before the Supreme Court issued its seminal Batson decision. In the ten years that have passed since Mata's conviction, Batson has been fleshed out and explained. We are convinced that the agreement in this case was unique at the time and is certainly an anachronism now. We are equally convinced that such jury selection collusion among litigants and judges is virtually certain never to be repeated.

D.   The Fair Cross-Section Claim

Mata argues that the agreement to exclude each black veniremember from the jury violated his sixth amendment right to a jury chosen from a fair cross-section of the community. Mata reasons that the practical effect of excluding eight black veniremembers by agreement, without the use of peremptories, is indistinguishable from the effect of having had an all-white venire from the outset. We see no merit in Mata's Sixth Amendment claim. Regardless of the practical effect, no prior case has held that exclusion of minority veniremembers by the parties during jury selection somehow relates back, so that the original venire can be

19

characterized as all-white. Thus, even if we were inclined to be the first to create such a legal fiction — which we are not — our authority to do so in the context of federal habeas review would be circumscribed by 28 U.S.C. § 2254(d)(1).

E. The Fair Trial Claim

Mata also argues that the totality of the circumstances surrounding his trial created an inherently prejudicial atmosphere, violating his due process right to a fair trial. Specifically, Mata claims that his trial was tainted to the point of reversible prejudice by the combined effects of excessive pretrial publicity, conspicuous presence of heavily armed security personnel in and around the courtroom, installation of surveillance cameras and metal detectors for the duration of the trial, and the intimidating presence of 30-40 uniformed prison guards as spectators in the courtroom throughout his trial. We note with some consternation, as did the state habeas court, that Mata does describe a factual situation that could provide the basis of a cognizable constitutional claim.[34] Nevertheless, our addressing the merits of this claim by Mata is proscribed.

_____

[34] See Woods v. Dugger, 923 F.2d 1454 (11th Cir.), cert. denied sub nom., Singletary v. Woods, 502 U.S. 953, 112 S.Ct. 407, 116 L.Ed.2d 355 (1991). In Woods, the Eleventh Circuit dealt with facts that were virtually indistinguishable from the facts Mata alleges in his petition. The defendant was convicted of murdering his prison guard. He was tried in a small town, where nearly 30% of the adult population worked for the prison, and the case was the subject of heavy pretrial publicity. On direct appeal, the Eleventh Circuit determined that the presence of a large number uniformed officers in the courtroom was inherently prejudicial and vacated the defendant's sentence. Unlike Mata, however, the defendant in that case objected to presence of the officers and raised the issue on direct appeal.

20

Federal habeas review is barred in all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule,[35] unless the petitioner can satisfy the new "cause and actual innocence" standard imposed by amended 28 U.S.C. § 2254(e)(2).[36]  The state habeas court disposed of Mata's claim on procedural grounds.  The Master's report, which the Texas Court of Criminal Appeals adopted in denying Mata's state habeas petition, determined that Mata failed to meet his pleading burden under Texas law.  Citing the Texas Court of Criminal Appeals' decision in Ex parte Empey,[37] the Master stated that Texas law requires a petitioner to offer, along with his habeas petition, at least some proof to support his factual allegations.  The Master concluded that, as Mata failed to

---

[35]  Coleman v. Thompson, 501 U.S. 722, 751, 111 S.Ct. 2546, 2565-66, 115 L.Ed.2d 640 (1991).

[36]  Section 2254(e)(2) states:

(2)  If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--
    (A)  the claim relies on--
        (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
        (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence;
    and
    (B)   the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

[37]  757 S.W.2d 771, 775 (Tex. Cr. App. 1988).

attach any affidavits, exhibits, newspaper clippings, letters from participants, or any other documents that might demonstrate or reflect the events that Mata described in his petition, Mata failed to establish a prima facie case and therefore was not entitled to an evidentiary hearing.

Mata has not offered any argument that the procedural ground relied on by the Master was unconstitutional, arbitrary, or pretextual. Thus, we conclude that the state habeas court's decision rested on adequate state procedural grounds. Moreover, even if we could press onward, we would stop short of the merits because it appears that Mata never made a contemporaneous objection to any of the factors that purportedly combined to deprive him of a fair trial. If Mata believed that the circumstances surrounding his trial were so pervasive that they compromised the jurors' ability to focus on the evidence and evaluate it fairly, then it was incumbent upon him to object and thereby provide the trial judge an opportunity to assess the situation and correct it if need be. Mata's appellate brief makes no mention whatsoever of any objections; and we have combed the record on our own in search of evidence that Mata made a contemporaneous objection to any of these factors, but to no avail. Under Texas law, Mata's failure to make a contemporaneous objection forfeited any error that might have occurred in the conduct of his criminal trial.[38] The Supreme Court

---

[38] See TEX. R. APP. P. 52(a) (1994)(to preserve complaint for appellate review, party must have presented to the trial court a timely request, objection, or motion, stating specific grounds for the ruling desired if specific grounds were not apparent from context).

has recognized valid state interests in adopting procedural rules that require defendants to make contemporaneous objections to preserve error for appellate or habeas corpus review.[39] As noted, an objection is required to inform the trial judge of the basis of the objection and afford him the opportunity to rule on it.

Mata's fair trial claim is procedurally barred, and he has demonstrated neither cause for the procedural default nor clear and convincing evidence that, but for the alleged courtroom distractions, no reasonable juror would have answered the special issues in the affirmative and subjected him to the death penalty. If Mata had objected at trial and raised the issue on direct appeal, then depending on the accuracy of the facts he alleges, he might have had a cognizable claim. It is also possible, but less likely, that Mata could have sought relief on direct appeal under a plain error analysis even though he failed to object at trial.[40] But absent a contemporaneous objection at trial, there are no circumstances under which Mata can raise this claim for the first time on collateral review.

III

CONCLUSION

---

[39] See Wainwright v. Sykes, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); Francis v. Henderson, 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976).

[40] See United States v. Olano, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)(declining to address the question whether a court, on direct appeal, may determine that an intrusion to which the defendant did not object should be presumed prejudicial even though traditional plain error review requires the appellant to demonstrate that the error "affect[ed] substantial rights").

23

We grant Mata's COA request, affirm the district court's denial of Mata's petition for habeas relief, and vacate the stay of execution issued by this court on March 12, 1996.

AFFIRMED.