REVISED DECEMBER 16, 1998

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

No. 98-20504
_____

WILLIS JAY BARNES,

Applicant,

VERSUS

GARY L. JOHNSON, Director, Texas Department of
Criminal Justice, Institutional Division,

Respondent.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____

November 9, 1998

Before DAVIS, DUHÉ, and PARKER, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Willis Jay Barnes, a Texas death row inmate, seeks a certificate of appealability ("COA") to challenge the district court's denial of his petition for writ of habeas corpus. For the reasons that follow, we deny Barnes's application for a COA.

### I. Facts & Procedural History

The district court below provided an in-depth and complete description of the facts. We recount the facts only as necessary for our analysis.

#### A. Facts

The body of eighty-four-year-old Helen Greb was found in her

home in Houston, Texas on February 14, 1988.  Her nude body was badly bruised and she had been sexually assaulted, probably with a bottle.  Her ribs and back were broken and she had been manually strangled.  The cause of death was "asphyxia due to manual strangulation and compression of the chest."

A kitchen window in Ms. Greb's house had been pried open and the telephone wire outside the house had been cut.  A second window at the back of the house had been opened and the screen pried loose.  There was a footprint from a tennis shoe in the kitchen sink below the kitchen window.  Police determined that a television set and two firearms were missing from the house.

The Houston Police located these missing items in the possession of Robert Glenn "Pokey" Davis, a known dealer in stolen property and a police informant.  Davis told the police that he had received the stolen items from Willis Jay Barnes.  On February 17, 1998, an arrest warrant for Barnes was issued charging him with theft by receiving, a misdemeanor offense.  Barnes was arrested the same day by Sergeant David E. Calhoun of the City of Houston Police Department, the primary investigator of Ms. Greb's murder.  Calhoun and his partner, Sergeant Robert Parish, handcuffed Barnes and read him his *Miranda* rights.  Barnes indicated that he understood his rights and had no questions.  Barnes was told only that he was under arrest for possession of stolen property, not that he was a capital murder suspect.

At approximately 6 pm, Calhoun brought Barnes into a police

2

interview room, where he was again read his *Miranda* rights. At the pretrial suppression hearing, Barnes testified that Calhoun initially told him that a woman was dead and Calhoun asked whether Barnes knew anything about her. Barnes also testified that Calhoun stated that police had recovered skin fragments from the dead woman's fingernails and had taken a shoe print from the home that would match Barnes's shoes. Calhoun, however, did not directly tell Barnes that he was a murder suspect.

At approximately 8 pm, after two hours of interrogation, Barnes agreed to give a written statement (the "first statement") stating that he had entered Ms. Greb's house through an open door, had found the house already ransacked, and had stolen the television and the two firearms. The statement was made on a "statement of a person in custody" form, which includes *Miranda* warnings on the top of every page. Calhoun reviewed these warnings with Barnes, and Barnes placed his initials next to each of the warnings. Barnes waived his *Miranda* rights and initialed this waiver on the statement form.

After the first statement was signed, around 10 pm, Sergeant J.W. Belk, who had witnessed the signing, remained alone with Barnes in the interview room. Belk had participated in a 1984 investigation of Barnes for burglary involving the aggravated sexual assault of an elderly woman. That investigation had resulted in Barnes pleading guilty to the burglary of four homes. Barnes served approximately three years of his thirty-year

3

sentence and was released from prison in October 1987.

At approximately 10:30 pm, Sergeant Parish entered the interview room to get permission to search Barnes's car. Barnes gave this permission. In addition, upon request, Barnes removed his shirt. He had scratches on his chest, on both arms, and under his left eye. The police took Barnes's clothes and provided him with a trusty uniform. They also took Barnes's shoes as evidence. Barnes was not given socks or shoes because the police were unable to find any. Calhoun testified that the next morning he brought in a pair of his own shoes and a pair of socks for Barnes.

Around midnight, Calhoun showed Barnes one of the stolen firearms and a picture of the television set. He asked Barnes if he would give a written statement identifying the items. Barnes agreed to give such a statement. Calhoun again reviewed the *Miranda* warnings with Barnes, who stated that he understood them. Calhoun began to type the statement (the "second statement") at approximately half past midnight. At approximately 1 am, Barnes read the statement, made and initialed some changes, and signed the statement in the presence of Belk and Parish. In this statement, Barnes admitted entering the house and stealing the firearms and television. However, he denied killing Greb.

After signing the second statement, Barnes was taken to the city jail. He was placed in a holding cell and then talked to a bailbondsman. Barnes slept from approximately 2:30 am to 4:30 am, when he was awakened for breakfast. After breakfast, he

4

slept from approximately 5:10 am to 8:00 am.  Barnes testified that he slept for a total of approximately five hours.

At approximately 8:30 am, February 18, 1988, Sergeant R.L. Doyle and Sergeant Sharon Durham brought Barnes to court.  Barnes was dressed in a jail uniform and was still barefoot.  Barnes was brought before Judge Michael McSpadden.  Barnes was informed that he was charged with the offense of "burglary of a habitation with intent to commit murder," a first-degree felony charge.  Judge McSpadden also informed Barnes of his *Miranda* rights.  As he stated each right, Judge McSpadden asked Barnes if he understood the right, and Barnes stated "Yes."

Judge McSpadden also questioned Barnes about his education. Barnes stated that he had received his G.E.D. and had twenty-nine hours of college credit.  He also stated that he had failed high school English, but had taken college English and had received a D.  Judge McSpadden noted Barnes's answers and observed that Barnes appeared to understand everything stated to him.  After the hearing before Judge McSpadden, Barnes was returned to the city jail, where he was given shoes and socks.  During both the journey to court and the return trip, Barnes was briefly outside barefoot in rainy and chilly weather.

Beginning at approximately 9:45 am, Calhoun interrogated Barnes further.  Before commencing interrogation, he read Barnes his *Miranda* rights.  Barnes stated that he had already been given his rights by Judge McSpadden and that he understood them. During this interrogation, Barnes again told Calhoun that he had

stolen the television and firearms, but continued to deny seeing anyone in the house. At approximately 11:45 am, Calhoun ceased the interrogation and left the interview room.

A few minutes later, Sergeant Belk stopped by the interview room and asked Barnes if he needed anything. Belk then accompanied Barnes to the restroom. While returning from the restroom, Barnes indicated that he wanted to talk to Belk. Back inside the interview room, Barnes brought out a copy of the written *Miranda* warnings from Judge McSpadden and read out loud the charge that was listed there, "burglary of a habitation with intent to commit murder." Barnes then told Belk, "I didn't intend to commit a murder. It was an accident."

Barnes explained that he had entered the house through the kitchen window, intending to take property and money. Greb had confronted him with mace and a rifle. She sprayed mace at him and they struggled. Barnes overcame Greb and left her lying on the floor. Barnes stated that after he had grabbed some cash, the television, and the firearms, he realized that Greb was not breathing and he attempted "mouth to mouth resperation." When this was unsuccessful, he covered her body and fled the scene.

Belk requested that Barnes repeat the events that took place so that Belk could type another statement. Belk again repeated Barnes's *Miranda* rights. Barnes again stated that he waived them. Belk began typing this statement (the "third statement") just after noon. When he finished, Barnes made and initialed two minor changes and then signed the statement. At the pretrial

6

suppression hearing, Barnes testified that his interrogators did not promise anything in exchange for his statement and did not force, coerce, or compel Barnes to make the statement. After Barnes made his third written statement, Calhoun obtained a warrant for capital murder.

Around 2 pm, Belk asked Barnes whether he would be willing to repeat his third statement on videotape. Barnes stated that he would. Barnes, Belk, and the camera operator were present in the videotape interview room when Barnes gave his videotaped statement (the "fourth statement"). Belk began by reading Barnes questions from a video statement checklist form. These questions included Barnes's *Miranda* rights and whether he understood and waived each right. With one exception that is discussed in-depth in Section II.B, Barnes stated that he understood and waived each right. Barnes then gave a statement on videotape that was consistent with his third written statement.

On June 22, 1988, Barnes was indicted for capital murder. Barnes's trial counsel moved that all of Barnes's statements be suppressed because they were not voluntary and were obtained in violation of Barnes's right to counsel. The trial court conducted a four-day evidentiary hearing on the motion to suppress, during which Barnes, Belk, Calhoun, Doyle, and Judge McSpadden all testified.

Following this four-day hearing, the trial court entered extensive findings of fact and conclusions of law, holding that Barnes's statements were voluntary. The court found that Barnes

7

had the mental capacity and education needed to understand the warnings and that there was no evidence of police misconduct during the interrogation. The court found that "all waivers of constitutional rights involved in each and every statement" were voluntarily and intelligently made. Thus, the trial court admitted all the written statements and the fourth, videotaped statement.

## B. Procedural History

A jury convicted Willis Jay Barnes of capital murder on March 16, 1989. A week later, he was sentenced to death. His conviction and sentence were upheld on direct appeal by the Texas Court of Criminal Appeals in September 1993. Barnes v. State, No. 70,858, slip op. (Tex. Crim. App. Sept. 22, 1993). The same court denied Barnes's motion for a rehearing in November of 1993. In April 1994, the United States Supreme Court denied Barnes's petition for a writ of certiorari. Barnes v. Texas, 511 U.S. 1063, 114 S. Ct. 1635, 128 L. Ed. 2d 357 (1994).

In July 1995, Barnes filed an application for a post-conviction writ of habeas corpus in state court. The district court conducted a limited evidentiary hearing on Barnes's allegation of ineffective assistance of counsel. The court entered findings of fact and conclusions of law and transmitted the post-conviction record to the Texas Court of Criminal Appeals. In February 1996, the Texas Court of Criminal Appeals entered an order stating that the trial court's findings of fact and conclusions of law were "supported by the record and upon

8

such basis the relief sought by the petitioner is denied." Ex Parte Barnes, Application No. 30,357-01 (Tex. Crim. App. Feb. 14, 1996).

In April 1997, Barnes timely filed a petition for writ of habeas corpus in federal district court. Respondent answered and filed a motion for summary judgment. The district court granted Respondent's motion for summary judgment and entered a Final Judgment denying Barnes's petition for a writ of habeas corpus and denying a COA. Barnes v. Johnson, No. H-97-400 (S. D. Tex. Apr. 30, 1998) (order denying writ of habeas corpus). Barnes now challenges the district court's denial of a COA. He requests that this Court grant a COA and direct the issuance of a writ of habeas corpus.

## C. AEDPA

The standards by which we determine whether to grant a COA are provided by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C.A. §§ 2241-55 (Supp. 1998). Under the regime set forth by the AEDPA, Barnes is required to obtain a COA from either the district court or this Court in order to proceed with an appeal. 28 U.S.C.A. § 2253(c)(1). To obtain a COA, a petitioner must make a substantial showing of the denial of a constitutional right. 28 U.S.C.A. § 2253(c)(2).

Barnes claims that the third written statement and the fourth videotaped statement were not voluntary. He argues that their admission at his trial violated his constitutional rights to counsel and to remain silent under the Fifth, Sixth, and

9

Fourteenth Amendments.

The voluntariness of a confession is ultimately a legal determination. See Miller v. Fenton, 474 U.S. 104, 112, 106 S. Ct. 445, 450-51, 88 L. Ed. 2d 405 (1986); Muniz v. Johnson, 132 F.3d 214, 219 (5th Cir.), cert. denied, 118 S. Ct. 1793 (1998). However, the determination may also involve subsidiary factual determinations and mixed issues of law and fact. Muniz, 132 F.3d at 219. Under the standards set forth by the AEDPA, for the issues that are purely legal or mixed law and facts, this Court must respect a state court's determination of voluntariness so long as it was not "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C.A. § 2254(d)(1); Drinkard v. Johnson, 97 F.3d 751, 767-68 (5th Cir. 1996), cert. denied, 117 S. Ct. 1114 (1997); see also Mata v. Johnson, 99 F.3d 1261, 1267 (5th Cir. 1996) (equating this form of review with the "clearly erroneous" standard). Purely factual subsidiary determinations are presumed to be correct and are overturned only if they were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d)(2). When challenging a state court's factual determinations, a petitioner must rebut this presumption of correctness by "clear and convincing evidence." 28 U.S.C.A. § 2254(e)(1).

## II. Applicant's Claims

Barnes argues that his confession--through his third written

10

statement and fourth videotaped statement--was not voluntary and that he was coerced into waiving his constitutional rights. He argues that the trial court thus erred in admitting the third and fourth statements at his trial. He provides six specific allegations of police "physical and mental coercion, fraud and deceit" to support his argument. Barnes alleges that: (1) the police deliberately and fraudulently misled him as to the charges that they intended to press; (2) the police did not cease interrogation after Barnes invoked his right to remain silent; (3) the police coerced him by interrogating him for ten hours and holding him in custody for over nineteen hours; (4) the police left Barnes without footwear for an extended period of time, during which he was outside at points; (5) the police prevented Barnes from sleeping for more than two or three hours at a time; and (6) the police's treatment of Barnes, when viewed in its entirety, was fundamentally unfair. We review these arguments to determine whether the trial court's decision to admit the third and fourth statements was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court . . . ." 28 U.S.C.A. § 2254(d)(1).

A. The Intentionally Fraudulent Charge

It is undisputed that for most, if not all, of Barnes's interrogation, he was not specifically told that he was a suspect

11

for capital murder.[1]  In addition, when he was brought before Judge McSpadden, Barnes was told that he was being charged with "burglary of a habitation with intent to commit murder," a charge that apparently does not technically exist.  Barnes alleges that these two aspects of his interrogation--he was not told that he was a capital murder suspect and he was brought before Judge McSpadden on a "made up" charge--render his confession involuntary.  We do not agree.

While Barnes was not directly informed that he was a capital murder suspect, from the beginning of his interrogation Barnes was aware that a woman had died in the house he was alleged to have burglarized.  Sergeant Calhoun mentioned Ms. Greb's murder shortly after Barnes was arrested.  Moreover, Barnes himself stated that he had seen on the television news that the woman living in the house he had burglarized had been killed.  In Barnes's first statement, he mentioned the death and attempted to divert attention from himself by mentioning someone that he had seen next door, stating "I think that this man had something to do with the old womans death."  Thus, it is clear that Barnes understood from the start that the police were investigating Ms. Greb's murder, not just theft of property.  He was also well aware that he was suspected of committing the murder.

A suspect's waiver of *Miranda* rights is not invalid merely

---

[1]  We assume for our purposes that this was an affirmative police decision made in an attempt to get Barnes to implicate himself in the murder.

12

because police interrogators did not advise him of the subject matter of the upcoming interrogation. Colorado v. Spring, 479 U.S. 564, 574, 107 S. Ct. 851, 857, 93 L. Ed. 2d 954 (1987). Similarly, the waiver is not invalid simply because the suspect did not have "a full and complete appreciation of all the consequences flowing from the nature and quality of the evidence in the case." Oregon v. Elstad, 470 U.S. 298, 317, 105 S. Ct. 1285, 1297, 84 L. Ed. 2d 222 (1985). In light of Barnes's clear understanding that the police were investigating a murder, the police's decision not to inform Barnes specifically that he was a capital murder suspect does not render his third and fourth statements involuntary.

Barnes's further argument that he was coerced and deceived by the abnormal charge of "burglary of a habitation with the intent to commit murder" is equally without merit. Section 30.02 of the Texas Penal Code defines burglary of a habitation as follows: "(A) A person commits an offense if, without the effective consent of the owner, he: (1) enters a habitation . . . with intent to commit a felony or theft." Tex. Penal Code Ann. § 30.02(a)(1) (Vernon 1997). Thus, in identifying Barnes's charge, the police added a superfluous phrase--"with the intent to commit murder"--to the crime of burglary of a habitation. All this phrase served to do, however, was to identify the particular felony that the police intended to use for the requisite "commit a felony or theft" element. The addition of this phrase cannot be said to have worked a deception upon Barnes. Indeed, the

13

inclusion of this phrase goes directly against Barnes's claim that he was deceived and coerced into confessing the murder because he was not informed that he was a capital murder suspect.

Finally, Barnes alleges that he was deceived and coerced by not being informed that he could receive the death penalty for the Greb's murder. There is no Supreme Court law requiring that a suspect be informed that he is suspected of an offense that could result in the death penalty. Indeed, the Supreme Court's decisions in <u>Colorado v. Spring</u>, 479 U.S. at 574, 107 S. Ct. at 857, and <u>Oregon v. Elstad</u>, 470 U.S. at 317, 105 S. Ct. at 1297, indicate just the opposite--a suspect need not be told that a statement or confession may expose him to the death penalty.

In sum, Barnes's claims of deceit and an "intentionally fraudulent charge" provide no support to his claim that the state court's determination of voluntariness was either contrary to, or an unreasonable application of, clearly established federal law, or, alternatively, an unreasonable determination of the facts.

B. The Fourth Amendment and Assertion of Rights

Barnes argues that prior to the videotaping of his fourth statement, he invoked his right to remain silent. Therefore, any statements made after this point could not have been admitted at trial without violating his constitutional rights. The transcript of Sergeant Belk's exchange with Barnes, however, makes it clear that at no point did Barnes unambiguously invoke his right to remain silent. Therefore, Belk did not violate Barnes's Fifth Amendment rights by continuing the videotaped

14

statement and the trial court did not err in admitting it.

The alleged invocation was recorded on videotape.  The transcript of that incident is as follows:

Q: I'm Sergeant J.W. Belk.
A: I'm Willis Jay Barnes.
Q: Okay, Willis.  That's B-A-R-N-E-S.
A: B-A-R-N-E-S.
Q: Okay.  I'm going to read you your warnings, and if at any point you don't understand, stop me and we will go through it.
A: Okay.
Q: You have the right to remain silent and not make any statement at all and that statement you make may be used against you and probably will be used against you at trial.  Do you understand that right?
A: I understand it.
Q: Do you waive this right?
A: No.
Q: Okay, do you understand what "waive" means?
A: It mean, uh, do I waive rights for you to do it, right?
Q: Well, it's explained . . . . you have the right to remain silent . . . .
A: Right.
Q: And you can remain silent and not say anything at all, or you can waive that right . . . .
A: Right, that's what I'm saying.  I waive what I'm saying, it's okay, what I'm saying is I'm giving you the right to put me that . . . to ask me these questions.  All right?
Q: Okay, and so you're waiving your right to remain silent and you are talking.
A: I am talking.
Q: Okay, so you understand that right . . .
A: I understand that right.
Q: And you are waiving that right?
A: Right.
Q: Okay.

After this exchange, Belk continued videotaping and Barnes gave

his fourth statement, which was consistent with his third written

statement.

The question raised by this dialogue is whether Belk should

have immediately ceased interrogation after Barnes replied "No."

15

Barnes argues that by continuing beyond this apparent invocation, Belk denied Barnes his Fifth Amendment right to remain silent.

The Supreme Court has held that if a suspect "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." Miranda v. Arizona, 384 U.S. 436, 474-75, 86 S. Ct. 1602, 1627, 16 L. Ed. 2d 694 (1966). In this case, it was not clear that the suspect wished to remain silent. Indeed, considering Barnes's previous statements and the fact that Barnes himself had initiated this particular discussion, Belk had every reason to believe that Barnes wished to talk.

The Supreme Court's most recent exposition on ambiguous invocations was in the context of whether a suspect invoked his Sixth Amendment right to counsel. In Davis v. United States, 512 U.S. 452, 459, 114 S. Ct. 2350, 2355, 129 L. Ed. 2d 362 (1994), the Court held that the determination of whether a suspect invoked his right to counsel is an objective one. The question is whether the suspect "articulate[d] his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Id. Other circuits have held that this "objective inquiry" into ambiguity is applicable to invocations of the right to remain silent.[2]

---

[2] See e.g. Medina v. Singletary, 59 F.3d 1095, 1100 (11th Cir. 1995), cert. denied, 116 S. Ct. 2505 (1996) (applying Davis's objective inquiry to determine whether suspect's invocation of the right to remain silent was ambiguous or equivocal); United States

16

This circuit has not yet determined whether the Davis analysis is applicable to invocations of the right to remain silent.  However, because Section 2254 is specifically focused on federal law as determined by the Supreme Court, we need not decide that issue here.  28 U.S.C.A. § 2254(d)(1).  We only need to decide whether the state court's decision to admit the fourth statement was contrary to clear Supreme Court law.  In light of the language and logic of the Supreme Court's decision in Davis, we cannot say that it was.

The majority opinion in Davis held that when faced with an ambiguous invocation of a right, an interrogator was not required to ask clarifying questions.  Davis, 512 U.S. at 461, 114 S. Ct. at 2356.  Nevertheless, the Court noted that it will "often be good police practice for the interviewing officers" to ask clarifying questions.  Id.  Thus, in the present case, Belk went beyond what the Supreme Court required and followed what the Court described as "good police practice."  He was presented with an ambiguous and surprising apparent invocation.  He asked a few

---

v. Banks, 78 F.3d 1190, 1197 (7th Cir.) (same), vacated on other grounds, 117 S. Ct. 478 (1996); c.f. United States v. Ramirez, 79 F.3d 298, 305 (2d Cir.), cert. denied, 117 S. Ct. 140 (1996) (assuming, arguendo, that Davis applies to invocations of the right to remain silent, but not holding that it definitely does); see also United States v. Johnson, 56 F.3d 947, 955 (8th Cir. 1995) (citing Davis while determining whether right to remain silent had been invoked).  The Texas Court of Criminal Appeals has also applied the Davis analysis to invocations of the right to remain silent.  Dowthitt v. Texas, 931 S.W.2d 244, 257 (Tex. Crim. App. 1996) (citing Davis and holding that statement, "I can't say more than that.  I need to rest." was not an unambiguous invocation of the right to remain silent).

17

explanatory, noncoercive questions that revealed that Barnes did not wish to invoke his right to remain silent.

In light of Davis and this clear record--in which an ambiguous statement was made and noncoercive clarifying questions revealed no intent to invoke the right to remain silent--the trial court's admission of the fourth, videotaped statement is not contrary to "clearly established Federal law, as determined by the Supreme Court . . . ."  28 U.S.C.A. § 2254(d)(1).[3]

### C. Barnes's Other Arguments

Barnes's additional arguments are heavily factual in nature. Barnes argues that his statements were not voluntary because he was coerced by the police.  He points to the length of his interrogation, his lack of footwear, and the fact that he was prevented from sleeping for more than three hours at a time.

The state court made factual determinations that these police actions were not coercive and therefore did not render the statements involuntary.  These state court factual determinations are entitled to a presumption of correctness.  28 U.S.C.A. §

---

[3]     Furthermore, as noted by the district court, even had there been error in admitting the fourth, videotaped statement, such error would probably have been harmless.  See Arizona v. Fulminante, 499 U.S. 279, 310-11, 111 S. Ct. 1246, 1265-66, 113 L. Ed. 2d 302 (1991) (holding that the admission of an involuntary confession is subject to harmless error analysis).  The fourth, videotaped statement is cumulative of the third statement. Therefore, had it been error to admit the fourth statement--which it was not--such error would probably have been harmless under the particular circumstances of this case.  See United States v. Ramirez, 963 F.2d 693, 698 (5th Cir.), cert. denied, 113 S. Ct. 388 (1992); Boles v. Foltz, 816 F.2d 1132, 1135-36 (6th Cir.), cert. denied, 108 S. Ct. 167 (1987).

2254(d)-(e).  As the district court noted in its meticulous analysis of the state court proceedings, the state court record does not support Barnes's claims that these police actions rendered his statements involuntary.

D. Totality of the Circumstances and Fundamental Unfairness

In light of our rulings on the previous issues, it is clear that under the totality of the circumstances, the admission of Barnes's third and fourth statements was not fundamentally unfair and did not violate Barnes's constitutional rights.

## III. Conclusion

Because Willis Jay Barnes has failed to make a substantial showing of the denial of a constitutional right, his application for a COA is DENIED.

19