United States Court of Appeals
Fifth Circuit

**F I L E D**

July 22, 2004

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
For the Fifth Circuit**

No. 02-11337

GEORGE ANDERSON HOPPER,

Petitioner – Appellant,

VERSUS

DOUG DRETKE, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
CORRECTIONAL INSTITUTIONS DIVISION,

Respondent – Appellee.

Appeal from the United States District Court
for the Northern District of Texas
(00-CV-601)

Before JONES, STEWART, and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:[*]

In 1992, George Anderson Hopper was convicted of capital murder and sentenced to death for the murder of Rozanne Gailiunas. After he exhausted his state remedies, Hopper filed a § 2254 petition for a writ of habeas corpus in federal district court raising seven grounds for relief. The district court denied

---

[*]Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth 5TH CIR. R. 47.5.4.

-1-

Hopper's petition in its entirety and refused to grant a certificate of appealability ("COA").

Hopper now seeks a COA on three[1] broad grounds: (1) ineffective assistance of counsel arising from a post-indictment polygraph and custodial interview that resulted in Hopper's confession to Rozanne's murder; (2) denial of his constitutional rights to counsel and silence during that custodial interview in violation of Miranda v. Arizona,[2] which would render Hopper's confession and certain after-acquired corroborating evidence inadmissible; and, (3) due process and confrontation clause violations arising from the lead investigator's surreptitious entry into a book deal about the case. We grant a COA on Hopper's ineffective assistance claim to the extent that the two-part analysis in Strickland v. Washington[3] is applicable. We also grant COA on Hopper's Miranda claims, but deny COA as to all other claims. After a review of the merits, however, we affirm the

_____

[1]Hopper's original brief articulates four "issues" for review. But the fourth issue is not an independent issue warranting separate review. Instead, this issue centers on the argument that the state courts and the district court have unreasonably applied the relevant legal standards and settled constitutional law in reviewing Hopper's claims. Because this is not truly an issue, but rather a general standard of review for habeas claims, see 28 U.S.C. §2254 (d), this court will not treat Hopper's fourth "issue" independently in this opinion. Therefore, the arguments raised in Hopper's fourth issue will be addressed only where relevant and applicable in this opinion.

[2]384 U.S. 436, 469-73 (1966).

[3]466 U.S. 668 (1984).

district court's denial of habeas relief as to the ineffective assistance and <u>Miranda</u> claims.

## BACKGROUND

On October 4, 1983, Rozanne Gailiunas was found unconscious in the bedroom of her home. She had been brutally assaulted and shot twice in the head. Rozanne never regained consciousness and died a few days later. Her murder went unsolved for several years until a tip to the police suggested that Rozanne's murder was arranged by Joy Aylor, the estranged wife of Rozanne's boyfriend. Police confirmed that Ms. Aylor paid $5,000 to have Rozanne killed, and were able to trace the money as it passed through the hands of several individuals. Each individual had skimmed a little of the money and passed the remainder along. The last person in this chain was Hopper, who apparently received $1,500 of the original $5,000.

The police began looking for Hopper in the summer of 1988 to discuss Rozanne's murder. At that time, the police did not know whether Hopper was Rozanne's killer. All the police knew then was that Hopper was the most recent person to receive the money.

Despite an attempt to flee from justice, Hopper was arrested on December 20, 1988 and arraigned the following day. But counsel was not appointed and Hopper made no request for counsel at that arraignment. On December 22, 1988, and despite his lack of counsel, Hopper contacted Detective McGowan offering to cooperate.

-3-

Hopper admitted that he had received the money to kill Rozanne, and that he had passed $1,000 of that money on to a drug dealer named "Chip." Hopper also gave Detective McGowan a description of Chip as well as information regarding Chip's usual haunts.

Hopper was not appointed counsel until December 27, six days after his arraignment and five days after he first willingly spoke with Detective McGowan and gave the detective the "Chip story." Jan Hemphill, the appointed counsel met with Hopper several times over the next few weeks as well as with the prosecution. The prosecution informed Hemphill of its intent to seek the death penalty for Joy Aylor as well as the shooter. The prosecution also told Hemphill that it was willing to work with all of the middlemen in the chain to get those two death penalty convictions. The record shows that Hemphill repeatedly advised Hopper of the prosecution's plans and discussed with him the risks of cooperation. The record also shows that Hemphill advised Hopper that her advice was based on the information that Hopper gave her.

On February 21, 1989, Hopper again contacted Detective McGowan and informed the detective of his intent to cooperate. Hopper also told Detective McGowan that he had spoken with Hemphill and that Hemphill had given Hopper permission to contact the police. Detective McGowan then called the prosecution who verified with Hemphill that Hopper had her permission to talk with the police. The prosecution also secured Hemphill's consent to give Hopper a

-4-

polygraph examination, and a blanket consent to talk to Hopper in the future without having to contact her first.

The following day, on February 22, 1989, Hopper met with Detective McGowan. Hopper was read his Miranda rights, and after waiving those rights, Hopper completed a six-page written statement detailing and supplementing the story he had previously given to Detective McGowan that inculpated the drug dealer Chip. After this interview, Hopper was told that the story would be verified by a polygraph examination to be scheduled in the upcoming few days.

Hopper was given a polygraph examination on February 27, 1989. Prior to this examination, he was again read his Miranda rights. After being told that the polygraph examination indicated falsity, and after receiving a fresh Miranda recitation, Hopper was questioned by Detective McGowan. The detective asked Hopper to tell the his story once again, starting at the beginning. After Hopper recounted the "Chip story," Detective McGowan told Hopper that McGowan believed Hopper was not telling the police the entire story. Detective McGowan then showed Hopper a picture of Chip and told Hopper that the police were close to locating Chip. The detective asked Hopper what would happen if the police questioned Chip and Chip passed a polygraph. Hopper said that the investigation would "lead back to me [Hopper]" and asked "Can I go back and think about it?" The detective responded, "Andy, I want the truth now." After a brief pause, Hopper admitted that he

killed Rozanne Gailiunas. He subsequently gave a factually detailed confession, which was both audio and videotaped. This confession, along with corroborating physical evidence, including the gun used to shoot Rozanne, were admitted into evidence at Hopper's trial. Additionally, testimony regarding an independent confession Hopper made to a jailhouse informant and an admission of guilt in a letter Hopper wrote to a close friend were admitted into evidence along with his police confession. The testimony of the jailhouse informant closely tracked the confession that Hopper gave to the police. The letter admission of guilt was not detailed, but in that letter Hopper wrote "I am the one who killed this person."

At trial, Hopper vigorously challenged the admissibility of the confession and argued a causation theory to the jury. Hopper's counsel admitted that Hopper was at the scene when Rozanne was shot and implicitly admitted that Hopper shot her. Using the results of a post-mortem toxicology test showing that Rozanne had a significant amount of Thorazine, a sedative, in her blood when she died, Hopper argued that it was the Thorazine that actually killed her instead of the bullet that entered her brain.[4] Hopper's theory, supported by an expert witness, was that the Thorazine exacerbated the brain swelling that Rozanne would have suffered from the bullet wound and made that brain swelling ultimately

---

[4]Although Rozanne had been shot twice in the head, one of the bullets lodged in her jawbone without penetrating her skull.

fatal. The prosecution presented its own expert testimony that contradicted Hopper's causation theory.

A jury convicted Hopper of capital murder in 1992 and he was sentenced to death. After Hopper was convicted, prosecutors became aware that Detective McGowan had entered into an agreement to work on a book about the murder of Rozanne Gailiunas. Evidence adduced in 1994 showed that Detective McGowan first considered the idea prior to Hopper's arrest and entered into an oral agreement to collaborate with a writer in late 1989 or early 1990, long after Hopper had confessed. However, a written agreement of collaboration was signed prior to Hopper's trial.

On direct appeal, the Texas Court of Criminal Appeals upheld Hopper's conviction and sentence but did not consider the newly discovered evidence of Detective McGowan's book deal. Hopper v. State, No. 71,477 (Tex. Crim. App. Nov. 5, 1997) (unpublished). Hopper did not seek a writ of certiorari from the United States Supreme Court, but instead, Hopper filed a state application for habeas corpus. The trial judge expanded the record to include the detective's book deal evidence, and entered findings of fact as well as conclusions of law in denying relief. The trial judge's findings and conclusions on Hopper's state habeas application were adopted by the Texas Court of Criminal Appeals in denying habeas relief. Ex parte Hopper, No. 23,163-02 (Tex. Crim. App. Mar. 1, 2000)(unpublished). On March 20, 2000, Hopper filed a petition for

a writ of habeas corpus in federal district court, which the court denied.

## DISCUSSION

Hopper's § 2254 habeas petition is subject to the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).[5] Under AEDPA, Hopper must obtain a COA before he can appeal the district court's denial of habeas relief.[6] If a COA is not granted, we lack jurisdiction to rule on the merits of Hopper's appeal.[7]

To obtain a COA, Hopper must make "a substantial showing of the denial of a constitutional right."[8] Making such a showing requires Hopper to demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."[9]

In <u>Miller-El v. Cockrell</u>, the Supreme Court instructed, as it

---

[5]<u>See</u> <u>Penry v. Johnson</u>, 532 U.S. 782, 792 (2001).

[6]28 U.S.C. § 2253(c)(1) (2000); <u>Slack v. McDaniel</u>, 529 U.S. 473, 478 (2000).

[7]<u>Miller-El v. Cockrell</u>, 537 U.S. 322, 336 (2003)("[U]ntil a COA has been issued federal courts of appeals lack jurisdiction to rule on the merits of appeals from habeas petitioners.").

[8]28 U.S.C. § 2253(c)(2) (2000); <u>Miller-El</u>, 537 U.S. at 336; <u>Slack</u>, 529 U.S. at 483.

[9]<u>Miller-El</u>, 537 U.S. at 336 (quoting <u>Slack</u>, 529 U.S. at 484).

-8-

previously held in Slack v. McDaniel, that we should "limit [our] examination to a threshold inquiry into the underlying merit of [the petitioner's] claims."[10] The Court observed that "a COA ruling is not the occasion for a ruling on the merit of petitioner's claim . . ."[11] Instead, our COA determination must be based on "an overview of the claims in the habeas petition and a general assessment of their merits."[12] "This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims."[13] We do not have jurisdiction to justify our denial of a COA based on an adjudication of the actual merits of the claims.[14] Accordingly, we cannot deny an "application for a COA merely because [we believe] the applicant will not demonstrate an entitlement to relief."[15] "[A] claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail."[16]

Even if we grant Hopper's application for COA, Hopper is not

---

[10]Miller-El, 537 U.S. at 327.

[11]Id. at 331.

[12]Id. at 336.

[13]Id.

[14]Id.

[15]Id.

[16]Id.

necessarily entitled to habeas relief.  "To prevail on a petition for writ of habeas corpus, a petitioner must demonstrate that the state court proceeding 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'"[17] A state court's decision is "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States . . . if the state court arrives at a conclusion opposite to that reached by the Court on a question of law or if the state court decides a case differently than the Court has on a set of materially indistinguishable facts."[18] A state court's decision "involves an unreasonable application of [] clearly established Federal law, as determined by the Supreme Court of the United States . . . if the state court identifies the correct governing legal principle from the Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."[19]

In making the "unreasonable application" inquiry, this court must determine whether the state court's application of clearly

---

[17]Robertson v. Cockrell, 325 F.3d 243, 247-48 (5th Cir. 2003) (en banc) (quoting 28 U.S.C. § 2254(d)(1) (2000)).

[18]Williams v. Taylor, 529 U.S. 362, 412-13 (2000).

[19]Id. at 413.

established federal law was objectively unreasonable.[20] "We have no authority to grant habeas corpus relief simply because we conclude, in our independent judgment, that a state supreme court's application of [federal law] is erroneous or incorrect."[21] "The federal habeas scheme leaves primary responsibility with the state courts for these judgments, and authorizes federal-court intervention only when a state court decision is objectively unreasonable."[22]

Finally, for Hopper to be entitled to habeas relief based on a constitutional "trial" error, he must demonstrate not only that the state court's decision was contrary to or an unreasonable application of clearly established federal law, but also that it was harmful under the standard set forth in Brecht v. Abrahamson.[23] "Under Brecht, a federal court may grant habeas relief on account of constitutional error only if it determines that the constitutional error had a 'substantial and injurious effect or

---

[20]Neal v. Puckett, 286 F.3d 230, 236 (5th Cir. 2002) (en banc), cert. denied, 123 S. Ct. 963 (2003).

[21]Catalan v. Cockrell, 315 F.3d 491, 493 (5th Cir. 2002)(quoting Neal, 286 F.3d at 236).

[22]Woodford v. Visciotti, 537 U.S. 19, 27(2002).

[23]507 U.S. 619 (1993). See also Robertson v. Cain, 324 F.3d 297, 304 (5th Cir. 2003).

influence in determining the jury's verdict.'"[24]

**(1)  Ineffective Assistance of Counsel**

Hopper first seeks a COA on his claim that his trial counsel provided ineffective assistance by failing to be present at, or negotiate an agreement with prosecutors to limit the scope of, the post-indictment polygraph examination and interview.  In order to establish his ineffective assistance of counsel claim, Hopper must show that his counsel's performance was deficient and that he was actually prejudiced by the deficient performance.[25]  Deficient performance is determined by examining whether the challenged representation fell below an objective standard of reasonableness.[26]  "So long as counsel made an adequate investigation, any strategic decisions made as a result of that investigation fall within the wide range of objectively reasonable professional assistance."[27]

---

[24]Robertson, 324 F.3d at 304 (quoting Brecht, 507 U.S. at 623 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).

[25]Strickland, 466 U.S. at 693-96.  In his reply brief, Hopper also seeks to raise an ineffective assistance claim based on the Supreme Court's decision in United States v. Cronic, 466 U.S. 648, 659 (1984).  In the absence of manifest injustice, this court will not consider arguments raised for the first time in a reply brief. See Najarro v. First Fed. Sav. & Loan Ass'n, 918 F.2d 513, 516(5th Cir. 1990)(citing Abbot v. Local Union No. 142, 429 F.2d 786 (5th Cir. 1970)).  A review of the record reveals that manifest injustice will not result from our deeming Hopper's Cronic argument waived.  Accordingly, we do not further consider that argument here.

[26]Kitchens v. Johnson, 190 F.3d 698, 701 (5th Cir. 1999).

[27]Smith v. Cockrell, 311 F.3d 661, 668 (5th Cir. 2002) (internal citations and quotation marks omitted).

"A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness."[28]  Furthermore, even if Hopper establishes that Hemphill's performance was deficient, he must also establish that "prejudice caused by the deficiency is such that there is a reasonable probability that the result of the proceedings would have been different."[29]  To do this, Hopper must show that the prejudice rendered the trial "fundamentally unfair or unreliable."[30]

Because defendants have a right to counsel at all critical stages of a proceeding,[31] reasonable jurists might debate whether Hemphill's decision not to attend the polygraph session or limit the scope of the examination falls outside the wide range of objectively reasonable professional assistance.  Because confessions are "like no other evidence"[32] and highly damaging to

---

[28]United States v. Jones, 287 F.3d 325, 331 (5th Cir.) (quoting Garland v. Maggio, 717 F.2d 199, 206 (5th Cir. 1983)), cert. denied, 123 S. Ct. 549 (2002).

[29]Ransom v. Johnson, 126 F.3d 716, 721 (5th Cir. 1997).

[30]Id. (quoting Lockhart v. Fretwell, 506 U.S. 364 (1993)).

[31]Styron v. Johnson, 262 F.3d 438, 447 (5th Cir. 2002)(internal citations omitted).

[32]See Arizona v. Fulminante, 499 U.S. 279, 298(1991).

-13-

a criminal defendant,[33] reasonable jurists might also debate the existence of actual prejudice in this case.  Therefore, a COA is warranted on this issue.

Despite our grant of COA, we find sufficient reason in the record to affirm the district court's denial of habeas relief.[34] In Strickland, the Supreme Court stated that a fair assessment of counsel's performance requires a reviewing court to "reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."[35]  Moreover, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[36]

We have held that counsel is not constitutionally ineffective for failing to discover, and make strategic decisions based on, evidence that a defendant consciously withholds from counsel.[37]  The constitution does not require perfect knowledge from counsel, and we cannot evaluate Hemphill's conduct under the distorting lens of

---

[33]Id. (internal citation omitted).

[34]This is not inconsistent with our decision to grant a COA on this issue, because COA should be granted even when "*every* jurist of reason might agree. . .that petitioner will not prevail."  See Miller-El, 537 U.S. 322, 338 (emphasis added).

[35]Strickland,466 U.S. at 689.

[36]Pratt v. Cain, 142 F.3d 226, 231 (5th Cir. 1998)(citing Williams v. Cain, 125 F.3d 269, 276 (5th Cir. 1997)).

[37]Lackey v. Johnson, 116 F.3d 149, 152 (5th Cir. 1997); Bryant v. Scott, 28 F.3d 1411, 1415 (5th Cir. 1994).

hindsight.[38]  Hopper knew that the "Chip story" was false, began cooperating with the police prior to having counsel appointed, and still sought to talk to police after learning from his counsel that the prosecution intended to seek the death penalty for the shooter. Hopper also knew that Hemphill's acquiescence in his second decision to cooperate with the police was based on her knowledge of only the "Chip story."  Yet, Hopper still made the decision to talk to the police for a second time.  While in an ideal world, counsel would have perfect knowledge and unlimited time in which to interview clients and formulate trial strategy, that is not what the constitution requires.[39]  "We will not find inadequate representation merely because, with the benefit of hindsight, we disagree with counsel's strategic choices."[40]

The Texas courts relied upon relevant and well-settled federal precedent and noted that the choices made by Hemphill were reasonable based upon the information that she had before her, and she kept Hopper reasonably informed of the consequences of cooperation with the police.  Hopper's failing of the polygraph exam and subsequent confession were regrettable from a defense

---

[38]Strickland, 466 U.S. at 691.

[39]See Yarborough v. Gentry, __ U.S. ___, 124 S. Ct. 1, 6 (2003)("[T]he Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight")(internal citations omitted).

[40]Green v. Johnson, 116 F.3d 1115, 1122 (5th Cir. 1997).

perspective but also reasonably unforeseeable under the totality of circumstances.  Therefore, finding no unreasonable application of the Strickland deficient performance standard, and concluding that it need not consider the prejudice prong of the Strickland test in the absence of a constitutionally deficient performance,[41] the district court properly denied habeas relief.

**(2)  Custodial Denial of Right to Silence and Counsel**

Hopper also seeks a COA on his claim that his Miranda rights were violated because Detective McGowan did not cease questioning Hopper when he asked "Can I go back and think about it?" during the post-polygraph interview on February 27, 1989.  Hopper claims that this failure renders the highly detailed and corroborated confession he made within moments of asking that question inadmissible.  Hopper argues that his question "Can I go back and think about it?" is both a request to remain silent and a request for counsel and the admission of his confession at trial therefore violated his Miranda rights.

Under Miranda v. Arizona,[42] a statement made by a person in custody is inadmissible unless that person was informed that he has the right to have an attorney present during questioning, the right to remain silent, and that anything that the person says may be

---

[41]466 U.S. at 697.

[42]384 U.S. 436 (1966).

used against him.[43]  A person may waive these rights, so long as the waiver is knowing and voluntary.[44]  Moreover, police must scrupulously honor a person's unambiguous invocation of these rights,[45] and once invoked, the police may not make any further attempts to elicit statements from that person unless that person initiates further communication.[46]  But ambiguous assertions of the right to counsel[47] and the right to silence[48] are not sufficient to trigger the cessation of police questioning.  Under <u>Davis v. United States</u>,[49] the test is whether a reasonable police officer would understand the request to be an invocation of a constitutionally guaranteed right under the circumstances in which the request is made.[50]  In <u>Davis</u>, the Supreme Court held that a suspect 's statement, "Maybe I should talk to a lawyer" uttered over an hour

---

[43]<u>Id.</u> at 444-45 (1966).

[44]<u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986).

[45]<u>Miranda</u>, 384 U.S. at 473-74.

[46]<u>Edwards v. Arizona</u>, 451 U.S. 477, 484-85 (1981); <u>Michigan v. Jackson</u>, 475 U.S. 625, 636 (1986).

[47]<u>See Davis v. United States</u>, 512 U.S. 452, 458-59 (1994).

[48]<u>See Barnes v. Johnson</u>, 160 F.3d 218, 224(5th Cir. 1999)(finding no invocation of right to silence when viewed in light of the suspect's prior statements and the fact that the suspect initiated discussion with police after hearing and waiving his <u>Miranda</u> rights).

[49]512 U.S. at 458-59.

[50]<u>Id.</u>

and a half into a custodial interrogation when he had previously waived his <u>Miranda</u> rights was an ambiguous assertion of the right to counsel.[51]  Expressly declining to "require law enforcement officers to cease all questioning" when a suspect makes an ambiguous or equivocal reference to an attorney,[52] the Court held that once a suspect validly waived his <u>Miranda</u> rights, police questioning could continue until the suspect "clearly requests an attorney."[53]

Because the application of the <u>Davis</u> test to Hopper's statements requires an assessment of not only the words he spoke, but also a determination of what a reasonable police officer would have understood those words to mean in the circumstances in which Hopper spoke them,[54] we find that reasonable jurists might debate whether the district court should have resolved the issue in a different manner.  Therefore, a COA is warranted on Hopper's <u>Miranda</u> claims.

Despite our grant of COA on these claims, we find sufficient reason in the record to affirm the district court's denial of habeas relief.  Both the district court and the Texas state courts

---

[51]<u>See</u> <u>Davis</u>, 512 U.S. at 458.

[52]<u>Id.</u> at 459-460.

[53]<u>Id.</u> at 461.

[54]512 U.S. at 458.

considered whether the statements made by Hopper and his decision to cooperate without the presence of his counsel were voluntary and whether the question "Can I go back and think about it?" was sufficient to require the cessation of the post-polygraph interview under the Supreme Court's decision in Davis. Hopper does not articulate a challenge to the voluntariness determinations made by the Texas state court and the district court in this case. He also he does not challenge the district and state courts' use of the Davis test in determining whether his Miranda rights were violated. Hopper does, however, contend that the courts unreasonably applied clearly established federal law when they determined that his confession was admissible because his question "Can I go back and think about it?" was too ambiguous to invoke his rights to remain silent and to counsel. This court disagrees.

In this case, Hopper first contacted Detective McGowan on December 22, 1988 after he was arraigned. Hopper made this contact and offered to talk before he had even been appointed counsel and did, in fact, talk. After Hopper was appointed counsel, Hopper still sought to cooperate and contacted the detective a second time. Hopper, knowing that cooperation was only in his best interest if he was not Rozanne's killer, met with the detective and gave the police a second voluntary statement on February 22, 1989. Despite receiving a Miranda rights recitation on each occasion, the record shows that Hopper made no request for counsel and never

-19-

elected to sit there and simply remain silent. It was not until his third meeting with Detective McGowan, on February 27, 1989, after he: (1) took the polygraph; (2) was told he failed that polygraph; (3)received another <u>Miranda</u> warning; and (4) agreed to speak and spoke with Detective McGowan again without his counsel present, that Hopper asked "Can I go back and think about it?" Yet this question came not at the beginning of that day's meeting or at the initiation of a first custodial interview. Instead it came after a fourth recitation of the "Chip story" and after Hopper was confronted with a picture of Chip. When Detective McGowan responded, "Andy, I want the truth now," Hopper immediately confessed to killing Rozanne Gailunas.

On direct appeal, as well as in the state habeas proceedings, the Texas courts applied the test set forth in <u>Davis v. United States</u>[55] and compared Hopper's question to statements found to be ambiguous by Texas and other state courts.[56] Based on Davis and the

_____

[55]512 U.S. at 459.

[56]<u>See</u> <u>Ex Parte Hopper</u> at pgs. 11, 12 (citing <u>Dowhitt v. State</u>, 931 S.W.2d 244 (Tex. Crim. App. 1996)(holding the statements "I can't say more than that. I need to rest" not to be an invocation of the right to silence); <u>State v. Bey</u>, 548 A.2d 887, 892 (N.J. 1988)(holding request to "lie down and think about what happened" not a clear invocation of the right to silence); <u>Delap v. Dugger</u>, 890 F.2d 285, 291-93 (11th Cir. 1989)(holding a suspect's questions about the length of the interview and when he could leave not an invocation of the right to remain silent); <u>State v. Bailey</u>, 714 S.W.2d 590, 593 (Mo. Ct. App. 1986)(holding a suspect's request for "some time to think alone" not an invocation of the right to silence)).

comparison, the Texas courts held Hopper's question was an ambiguous invocation of his rights to counsel and silence under the circumstances in which Hopper asked that question. The Texas courts concluded that under the rule set forth in <u>Davis</u>, the police would not have reasonably understood that Hopper was invoking his rights to counsel and silence, and therefore Hopper's subsequent confession was admissible at his trial.

While <u>Davis</u> expressly applies to the question of whether a defendant has invoked his right to counsel, neither the Supreme Court nor this court has expressly held that <u>Davis</u> applies in cases where the question is whether a person has invoked his right to remain silent.[57] But this court has twice held that a state court does not run afoul of clearly established federal law when it applies <u>Davis</u> in such circumstances.[58] Moreover, if the statement "Maybe I should talk to a lawyer" made in <u>Davis</u> is an ambiguous request for counsel insufficient to warrant cessation of police questioning,[59] the question "Can I go back and think about it?" uttered in the specific circumstances of this case is also an ambiguous query which does not require that the interrogation

---

[57]<u>See</u> <u>Soffar v. Cockrell</u>, 300 F.3d 588, 594 (5th Cir. 2003)(en banc)(internal citations omitted).

[58]<u>See</u> <u>Barnes</u>, 160 F.3d.at 224; <u>Soffar</u>, 300 F3d at 594 n.5.

[59]<u>See</u> <u>Davis</u>, 512 U.S. at 461.

cease.[60]

In light of our precedents[61] and the specific circumstances in this case, we cannot conclude that the state courts unreasonably applied clearly established federal law in concluding that Hopper's confession was admissible because he failed to clearly invoke either his Miranda right to counsel or right to silence in order to stop the police questioning. Therefore, we affirm the district

[60]Three of our sister circuits have determined that state courts do not unreasonably apply clearly established federal law by using Davis to determine whether a suspect has invoked his right to silence. See, e.g., James v. Marshall, 322 F.3d 103, 108-09 (1st Cir. 2003)(finding that a suspect's negative answer to question "Do you wish to make a statement at this time" ambiguous under the circumstances where the suspect then answered "yes" to the officer's follow-up question, "Can I talk to you about what happened tonight?" and finding state court did not err in applying Davis); Burket v. Angelone, 208 F.3d 172, 200 (4th Cir. 2000)(finding that "I just don't think I should say anything" is an equivocal request to remain silent); Caldwell v. Bell, 9 Fed. Appx. 472, 480 (6th Cir. 2001)(finding suspect's answer "I'd rather not" when asked if he would talk to the authorities ambiguous under Davis). Three more have found that Davis directly applies to the question of whether a suspect has invoked his right to silence . United States v. Ramirez, 79 F.3d 298, 303 (2d Cir. 1996)(applying Davis to determine that a suspect's silence in the face of two questions was not "even an equivocal invocation of his right to remain silent" when the suspect answered many others and had previously waived his Miranda rights); McGraw v. Holland, 257 F.3d 513, 519 (6th Cir. 2001)(finding that while the test in Davis applies to invocations of the right to silence, the suspect's statement "I don't want to talk about it" was an unambiguous assertion of her right to silence); Coleman v. Singletary, 30 F.3d 1420,1424 (11th Cir. 1994)(noting that prior 11the Circuit rule requiring the cessation of all questioning even when a suspect ambiguously invokes a Miranda right was overruled by Davis).

[61]See Barnes, 160 F.3d.at 224; Soffar, 300 F.3d at 594, 595 (discussing the "fairly strict" standards for evaluating claims in habeas petitions that the rights to silence and/or counsel were invoked).

court's denial of habeas relief with respect to both of Hopper's <u>Miranda</u> claims.

## (3) The Book Deal

Hopper contends that a COA should be granted on whether his due process rights under <u>Brady v. Maryland</u>[62] as well as his rights under the Sixth Amendment confrontation clause were violated because his defense counsel was not informed that Detective McGowan signed an agreement to write a book about the case prior to trial. Hopper also contends that the existence of this book deal constitutes structural error not subject to harmless error review under <u>Brecht</u>. We deny COA on these claims.

First, Hopper is not entitled to relief under the confrontation clause. The Sixth Amendment's confrontation clause is not so much a requirement for the disclosure of certain types of evidence as it is a guarantee that a criminal defendant have the opportunity to physically face the individuals testifying against him.[63] Hence, the confrontation clause is not a guarantee for effective cross-examination.[64] Instead, it is a guarantee of an opportunity for effective cross-examination.[65] Only in instances

---

[62]373 U.S. 83 (1963).

[63]<u>See</u> <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39, 51 (1987).

[64]<u>Delaware v. Fensterer</u>, 474 U.S. 15, 19-20 (1985).

[65]<u>Id.</u>

where cross-examination is limited by a specific statutory or court-imposed restriction do the protections of the Sixth Amendment's confrontation clause come into play.[66]  In this case, the non-disclosure of the book deal was not due to the operation of any Texas state law or any specific trial court's ruling.  Rather, the non-disclosure was due to Detective McGowan's decision to remain silent about the deal and there is no evidence that the prosecution knew of the detective's conflict of interest until well after Hopper's trial.  In light of these facts and the relevant Supreme Court precedent,[67] reasonable jurists could not debate whether Hopper's claim based on the confrontation clause should have been decided differently.

Second, Hopper has not established a Brady violation.  In Brady, the Supreme Court held that an accused's due process rights are violated when evidence that is material to either the guilt or punishment phase of a trial is suppressed.[68]  Material evidence is evidence that has a reasonable probability of altering the result of the trial or sentence.[69]  The measure of that "reasonable probability" for Brady claims is when the evidence suppressed, in

---

[66]Fensterer, 474 U.S. at 1920; Ritchie, 480 U.S. at 53-54; Kentucky v. Stincer, 482 U.S. 730, 738 n. 9 (1987).

[67]Fensterer, 474 U.S. at 1920; Ritchie, 480 U.S. at 53-54; Kentucky v. Stincer, 482 U.S. 730, 738 n. 9 (1987).

[68]Brady, 373 U.S. at 87.

[69]Bagley, 473 U.S. at 682.

-24-

light of the entire record, undermines confidence in the verdict or sentence imposed.[70]  Under Brady, the prosecution is required to provide the defense any available exculpatory evidence or impeachment evidence.[71]

In order to state a claim under Brady, a habeas petitioner must establish that: (1) the prosecution suppressed evidence; (2) the evidence was favorable to the accused because it was exculpatory or impeaching; (3) the evidence was material to either guilt or punishment.[72]  Because Brady's suppression prong encompasses evidence withheld by the police even if the prosecution was unaware of its existence,[73] Texas conceded at the state habeas proceeding, as it does here, that the book deal evidence was suppressed and could have been used to impeach Detective McGowan's testimony.  The relevant question then becomes whether the book deal evidence is material.

Both the state habeas court and the district court found that it was not.  Both courts looked at the entirety of the record, which included testimony regarding Hopper's confession by a police officer other than Detective McGowan, a jailhouse confession, and

---

[70]Id.; Kyles v. Whitney, 514 U.S. 419, 433-37 (1995).

[71]United States v. Bagley, 473 U.S. 667, 682 & 683-84 (1985).

[72]See United States v. Ellender, 947 F.2d 748, 756 (5th Cir. 1991)(internal citations omitted).

[73]Kyles, 514 U.S. at 438.

a letter admission of guilt, as well as strong physical corroborating evidence. The courts also noted that the timing of Detective McGowan's book deal, which was not formalized until after Hopper's arrest and confession, did not support an inference of improper purpose in the detective's investigation or trial testimony. Furthermore, both courts examined the nature and timing of the compensation received by Detective McGowan as a result of the book deal and concluded that none of the compensation received was tied to or affected the outcome of Hopper's trial.

This court has held that a materiality determination regarding withheld impeachment evidence requires a court to look to whether the testimony of the witness who would have been impeached was corroborated by other evidence.[74] As the state habeas court and the district court duly noted, the vast majority of Detective McGowan's testimony was corroborated. In addition to Hopper's police confession, there was also a jailhouse confession and a letter admitting his guilt. Furthermore, not only was there physical evidence corroborating Hopper's confession, such as the gun, Hopper did not contest at the guilt phase of the trial that he shot the victim. Instead, he argued that the shots fired were not the cause of her death. Hopper has alleged no new facts, such as evidence that Detective McGowan planted evidence or influenced the content

---

[74]Kopycinski v. Scott, 64 F.3d 223, 226 (5th Cir. 1995)(citing United States v. Weintraub, 871 F.2d 1257, 1262 (5th Cir. 1989)).

of Hopper's confession, that undermine the confidence of Hopper's guilty verdict. And Hopper articulates no argument that the existence of the book deal had any effect on his death sentence. Therefore, under these case facts, reasonable jurists could not debate whether the evidence of Detective McGowan's book deal was sufficiently material to make out a Brady claim or that the district court should have resolved this issue in a different manner. Accordingly, we deny Hopper's request for a COA on this claim.

Finally, Hopper argues that the existence of the book deal constitutes structural error warranting immediate reversal of his conviction. As the district court noted, the cases Hopper used to support this claim are factually distinguishable and do not stand for the proposition that the existence of a media deal is structural error *per se*. In fact, the Supreme Court has only identified a precious few circumstances that qualify as structural error.[75] None of these rare circumstances are present in this case. Furthermore, the Supreme Court has also noted that most trial errors of constitutional magnitude should "be quantitatively assessed in the context of other evidence presented in order to

---

[75] See Fulminante, 499 U.S. at 309 n.8(quoting Chapman v. California, 386 U.S. 18, 24 n.8 (citing Payne v. Arkansas, 356 U.S. 560 (1956) (coerced confession); Gideon v. Wainright, 372 U.S. 335 (1963), (right to counsel); Tumey v. Ohio, 273 U.S. 510 (1927) (impartial judge))).

determine whether its admission was harmless beyond a reasonable doubt."[76] And in denying Hopper's request for COA on this issue under Brady we have found that Hopper has not made a substantial showing that he was denied any constitutional right. Thus, reasonable jurists could not debate whether the district court's disposition of this claim should have been resolved differently and the request for COA is concomitantly denied.

## CONCLUSION

With respect to Hopper's claims that Hemphill provided ineffective assistance of counsel under Strickland v. Washington and that his Miranda rights were violated when his confession was admitted at trial, we GRANT his application for COA. But we conclude that the district court did not err in denying habeas relief on these claims, and we therefore AFFIRM the district court's denial of relief. We also DENY Hopper's application for COA on his other claims. Therefore, we lack jurisdiction to review the district court's denial of habeas relief as to these claims.

**COA GRANTED IN PART; COA DENIED IN PART; AFFIRMED.**

---

[76]See id. at 307–08.