# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2017-KA-00379-SCT

*GEROME MOORE a/k/a GEROME MONTREAL
MOORE*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/02/2017 |
| TRIAL JUDGE: | HON. JEFF WEILL, SR. |
| TRIAL COURT ATTORNEYS: | RANDY HARRIS |
| | AAFRAM Y. SELLERS |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JACOB W. HOWARD |
| | PHILLIP W. BROADHEAD |
| | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JOE HEMLEBEN |
| | KATY TAYLOR GERBER |
| DISTRICT ATTORNEY: | ROBERT SHULER SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED IN PART; VACATED AND REMANDED IN PART - 05/30/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CHAMBERLIN, JUSTICE, FOR THE COURT:**

¶1.    A Hinds County grand jury indicted Gerome Moore for the capital murder of Carolyn

Temple during the commission of a robbery.  After a trial in the Circuit Court of the First

Judicial District of Hinds County, a jury convicted Moore of capital murder.  The trial court

conducted a sentencing hearing as provided in *Miller v. Alabama*[1] and sentenced Moore to life imprisonment without parole. Moore now appeals both his conviction and his sentence.

¶2. We affirm Moore's conviction of capital murder. Moore, though, had a statutory right to be sentenced by a jury. Thus, we vacate his sentence and remand the case for Moore to be resentenced by a jury.

## FACTS AND PROCEDURAL HISTORY

¶3. On January 7, 2015, Moore, Antreal Jones and Antwain Dukes traveled in a maroon Impala to North Jackson in order to commit a robbery. Moore drove the group into Jackson, near downtown. They spotted Carolyn Temple exit a store, get in her white Mercedes and pull out onto the road. Moore decided to tail the Mercedes so that they could rob Temple. Moore followed Temple into the Belhaven neighborhood to the corner of Euclid Street and Pine Street. As Temple pulled into a driveway on Pine Street, Moore slowed the Impala for Dukes and Jones to get out.

¶4. As Dukes got out of the car, Moore handed him his loaded .380 handgun. Dukes and Jones then robbed Temple at gunpoint and shot her in the stomach.

¶5. After letting Dukes and Jones out, Moore turned the Impala around and idled on the street during the shooting. After the robbery, Dukes and Jones ran back to the car with Temple's purse. Once Dukes got back in the car, he handed the gun back to Moore and exclaimed, "She would not give up the purse, so I blasted the bitch." Moore drove the group away from the crime scene. As they drove away, someone threw Temple's purse out of the

---

[1] *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012).

window.

¶6.     Lance Tennyson, Temple's neighbor, had heard the gunshot and saw the "dark burgundy-maroonish" car drive away, down Euclid Street. Tennyson heard the gunshot while he was watching television in his living room; he went to his front porch and looked toward the sound. He saw a car idling on Euclid Street. Just then, two black males ran up Pine Street. One got in the front passenger seat of the car, and the other entered the rear passenger seat of the car. The car then drove away. According to Tennyson, someone had already been sitting in the driver's seat of the car.

¶7.     As Moore drove away, Temple lay in the driveway clutching her stomach. She also had a wound to her head that was consistent with being struck with a blunt object. Soon after the shooting, neighbors—including Tennyson—ran to the scene and notified law enforcement. Once law enforcement arrived, Temple described her attackers as two black males in a maroon Impala. Temple was transported to the hospital and later died as a result of the gunshot wound.

¶8.     Police recovered a single shell casing in the driveway. During the autopsy, a bullet was recovered from Temple's spinal canal. The bullet was determined to have been fired from a .380 handgun.

¶9.     Detective Daryl Owens led the investigation into Temple's murder. Moore developed as a person of interest in the crime. Detectives Jermaine Magee and Rozerrio Camel interviewed Moore on January 13, 2015. Before questioning, Detective Magee informed

3

Moore of his *Miranda*[2] rights.  Moore indicated that he understood his rights and initialed beside a list of each one of them on a waiver form.  Moore also signed and dated the form under the list of rights.

¶10.    Detective Magee then recited the waiver paragraph from the form and encouraged Moore to read along with him.  He asked Moore if he understood the waiver.  Moore lifted his head in acknowledgment, mouthed an unintelligible response (that was affirmative in nature) and began to reach for his pen.  Before he picked up the pen, Detective Magee asked him, "Okay.  You wanna tell us, give us a statement?"  Moore answered, "No, sir.  I ain't, I ain't do nothin'."  Magee followed up, "Do you want to give us a statement and tell us?"  Moore did not verbally answer Detective Magee's second question.  After a pause, he shook his head twice, negatively.  Detective Camel then asked him, "Honest, do you want to talk to us?"  Moore responded, "No, sir.  I'll talk to y'all, but . . . ."[3]  Detective Magee then stated, "Okay.  Sign it.  Sign it right here."  Next, Moore picked up the pen and signed the waiver form.

¶11.    After Moore signed the waiver, Detectives Magee and Camel questioned him, and Moore did not indicate any desire to stop answering questions.  He also did not invoke his right to counsel.  In the end, Moore confessed to participating in the planning and execution

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3] It is unclear exactly what Moore said here.  From a review of the recording in the record, Moore's "No, sir" is not clear and could, arguably, be a "Yes, sir," since it sounds different than Moore's first clear "No, sir" and has a more audible "z" sound.  Also, it is possible that the second portion of Moore's statement is, "*I'd* talk to y'all, but." (Emphasis added.)

of the robbery that resulted in Temple's death.

¶12. On February 19, 2015, a grand jury indicted Moore for the capital murder of Temple. Moore filed a pretrial motion to suppress his interview with law enforcement. In his motion, he argued that the statement was given under duress and that he did not waive his constitutional rights voluntarily and knowingly. At the suppression hearing, both detectives testified that nothing about Moore's demeanor indicated that he did not understand his rights. They also claimed that Moore was not coerced, threatened or offered anything in return for his statement. Further, both detectives did not notice anything in the interview that would have indicated that Moore was under the influence of any narcotics or illegal drugs. Detective Magee also maintained that nothing about Moore's demeanor or interactions gave him any reason to believe that Moore—in light of his youth—did not understand his rights.

¶13. The circuit court denied Moore's motion to suppress. It found that the State had proved its prima facie case that the statement was given voluntarily, intelligently and knowingly. The circuit court noted that Moore did not offer any evidence to counter the State's witnesses.

¶14. A jury trial was held on September 12, 2016. Once the state rested, Moore moved for a directed verdict, and the trial court denied the motion. At the close of the three-day trial, the jury convicted Moore of capital murder. Moore filed a motion for judgment notwithstanding the verdict or, in the alternative, a new trial.

¶15. Before sentencing, Moore filed a motion for funds for expert assistance in the field of mitigation and a motion to bar a sentence of life without parole or, in the alternative, for

sentencing before a jury. The trial court denied Moore's sentencing motions and held a *Miller* sentencing hearing on March 2, 2017. The trial court sentenced Moore to life imprisonment without the possibility of parole. The trial court also denied Moore's motion for judgment not withstanding the verdict or, in the alternative, a new trial. Moore timely appealed.

¶16. On appeal, Moore contends (1) that the trial court erred in denying his motion to suppress, (2) that his counsel provided ineffective assistance of counsel, (3) that he had a statutory right to be sentenced by a jury and (4) that the trial court erred in denying his motion for funds. We will address each in turn. While Moore raises other issues, these four issues are dispositive.

## STANDARD OF REVIEW

¶17. Given the distinct standards of review applicable on appeal, we will address each standard as it arises. Of course, "[w]here an appeal raises a question of law, the applicable standard of review is de novo." *Jones v. State*, 122 So. 3d 698, 700 (Miss. 2013) (citing *Lambert v. State*, 941 So. 2d 804, 807 (Miss. 2006)).

## ANALYSIS

### I. Denial of the Motion to Suppress

¶18. Moore argues that the recording of his interview with law enforcement is inadmissable because Moore failed to voluntarily, knowingly and intelligently waive his *Miranda* rights. Also, on appeal Moore alleges—for the first time—that law enforcement violated his right to remain silent.

## A. Waiver

¶19. Moore argues that Detectives Magee and Camel's questions about whether he wanted to give a statement or talk to them overrode his will, rendering his waiver ineffective. Moore also argues that his age, mental capabilities and drug use rendered his waiver ineffective.

¶20. We will only reverse a trial court's denial of a motion to suppress "if the ruling is manifest error or contrary to the overwhelming weight of the evidence." *Barnes v. State*, 30 So. 3d 313, 316 (Miss. 2010) (citing *Ruffin v. State*, 992 So. 2d 1165, 1169 (Miss. 2008)). "[T]he Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination requires that the accused be advised of his right to remain silent and his right to counsel before any custodial interrogation. Once advised of his *Miranda* rights, an accused may waive these rights and respond to interrogation." *Jordan v. State*, 995 So. 2d 94, 106 (Miss. 2008) (citations omitted).

¶21. Waiver of the constitutional rights to remain silent and to counsel must be voluntary, knowing and intelligent. *Miranda*, 384 U.S. at 444. Whether a defendant voluntarily, knowingly and intelligently waives his rights is a factual question to be determined by the trial court under the totality of the circumstances. *McGowan v. State*, 706 So. 2d 231, 235 (Miss. 1997). "Waiver is considered voluntary if it is the result of a 'free and deliberate choice rather than intimidation, coercion or deception.'" *Roberts v. State*, 234 So. 3d 1251, 1260 (Miss. 2017) (quoting *Jordan*, 995 So. 2d at 106). "[T]he prosecution shoulders the burden of proving beyond a reasonable doubt that the confession was voluntary." *Dancer v. State*, 721 So. 2d 583, 587 (Miss. 1998) (internal quotation marks omitted) (quoting

*Morgan v. State*, 681 So. 2d 82, 86 (Miss. 1996)). Further, "the mental abilities of an accused are but one factor to be considered in determining whether the confession was knowingly, intelligently and voluntarily made." *Id.* (internal quotation marks omitted) (quoting *McGowan*, 706 So. 2d at 235).

¶22. Moore voluntarily, knowingly and intelligently waived his constitutional rights. Moore was clearly informed of his right to remain silent. As a subset of this right, Detective Magee informed Moore that anything he said could and would be used against him in a court of law. Moore was also informed of his right to have a lawyer, appointed or otherwise, present during his questioning. Further, Moore was told that he could decide to exercise his rights at any point during the interview. With this last statement to Moore, Detective Magee actually went above and beyond *Miranda*'s requirements. *See Brown v. State*, 130 So. 3d 1074, 1078–79 (Miss. 2013) (affirming "the four-fold warning required by *Miranda*" that did not include an explicit notice of the suspect's right to cease interrogation at any time).

¶23. Throughout the waiver exchange, Moore repeatedly indicated that he understood his rights and waiver of them. There was no indication that the detectives were rushing Moore at any point during the explanation of Moore's rights and his waiving them. Further, there was no indication by either detective that Moore would not have been allowed as much time as he needed to review the waiver form before signing it.

¶24. As to the voluntariness of Moore's waiver, Moore indicated that he understood the recitation of the waiver and reached for the pen on the table—presumably to waive his rights. Detective Magee then interrupted him with additional questions.

¶25. Substantial, credible evidence exists in the record to affirm the circuit court's finding that Moore's statement was voluntary despite Detectives Magee and Camel's series of three questions. While the details of the individual questions and responses from Moore will be addressed in the analysis of Moore's right to remain silent, the detectives' questions served to heighten Moore's awareness of his right to remain silent. He had already begun reaching for his pen presumably to waive his rights and only stopped when Detective Magee asked the first question of the series. Also, Moore's last response indicated his willingness to talk to the detectives. Instead of immediately interrogating him, the detectives instructed Moore to waive his rights by signing the waiver form. Moore voluntarily picked up his pen and waived his rights without any hesitation.

¶26. Further, the State's testimony at the suppression hearing established its prima facie case that the statement was given voluntarily, knowingly and intelligently. Both detectives asserted that there was no indication from Moore's demeanor, words or actions that his waiver was not voluntary, knowing and intelligent. Moore offered no evidence in rebuttal.

¶27. Defense counsel's claim that Moore's youth or lack of mental capability rendered his waiver unknowing and unintelligent was unsupported by any evidence at the suppression hearing. Further, no legal authority supports the argument that a minor's parent must be present before a statement to law enforcement may be admissible at trial. *See Clemons v. State*, 733 So. 2d 266, 270 (Miss. 1999); *Blue v. State*, 674 So. 2d 1184, 1205 (Miss. 1996) ("Because the nature of this case was one in which the offender could receive life imprisonment or death and the circuit court had original jurisdiction, Blue's age had no

9

special bearing on his ability to be questioned without a parent and voluntarily waive his rights."), *overruled on other grounds by **King v. State***, 784 So. 2d 884 (Miss. 2001).

¶28.    Last, defense counsel raised the issue that Moore's statement was inadmissable because he informed the detectives that he took various prescription drugs and had smoked "spice" in the days prior to the interview.  First, at the suppression hearing, Moore offered no evidence of his drug use.  Second, the detectives testified that Moore's demeanor did not indicate that he was under the influence of any substance.  Third, the video of Moore's confession does not indicate that Moore was under the influence of any substance.

¶29.    The State met its burden to offer a prima facie case that Moore's statement was voluntary, knowing and intelligent.  Moore offered no evidence in rebuttal.  Given this Court's standard of review of the circuit court's factual ruling, the circuit court's denial of Moore's motion to suppress—on the issue of his waiver—was not manifest error.

### B.    Right to Remain Silent

¶30.    On appeal, Moore argues—for the first time—that his statement was inadmissible, since it was taken after he asserted his right to remain silent.  "Generally, issues not presented to the trial court are procedurally barred on appeal."  ***Debrow v. State***, 972 So. 2d 550, 553 (Miss. 2007) (citing ***Williams v. State***, 794 So. 2d 181, 187 (Miss. 2001), *overruled on other grounds by **Brown v. State***, 995 So. 2d 698, 703 (Miss. 2008)).  As Moore did not raise the issue in the trial court, we will review the issue for plain error.  Under the plain-error doctrine the Court "can recognize obvious error which was not properly raised by the defendant on appeal, and which affects a defendant's 'fundamental, substantive right[s].'"  ***Smith v. State***,

10

986 So. 2d 290, 294 (Miss. 2008) (quoting *Debrow*, 972 So. 2d at 553). "Plain-error review is properly utilized for 'correcting obvious instances of injustice or misapplied law.'" *Id.* (quoting *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 256, 101 S. Ct. 2748, 69 L. Ed. 2d 616 (1981)).

¶31. "At the outset, if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent." *Miranda*, 384 U.S. at 467–68. "The warning of the right to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court." *Id.* at 469. "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.* at 473–74. When law enforcement officers are unsure whether a suspect intends to invoke his right to remain silent, it is "good police practice for the interviewing officers" to stop questioning on any other subject and clarify with the suspect whether or not he intends to invoke his constitutional right. *See Davis v. United States*, 512 U.S. 452, 461, 114 S. Ct. 2350, 2356, 129 L. Ed. 2d 362 (1994) (right-to-counsel case). In Mississippi, "[i]f a defendant makes *equivocal* or *ambiguous* utterances which could be interpreted as an invocation, then the trend is to require cessation of interrogation except for strictly-limited inquiry for clarification purposes." *Holland v. State*, 587 So. 2d 848, 856 (Miss. 1991) (right-to-counsel case).

¶32. While the United States Court of Appeals for the Fifth Circuit has not formally extended *Davis*'s application to the right to remain silent, it has discussed *Davis* within the

11

right-to-remain-silent context. *See Hopper v. Dretke*, 106 F. App'x 221, 232 n.60 (5th Cir. 2004) (surveying other circuits' application of *Davis* in the right-to-remain-silent context); *Soffar v. Cockrell*, 300 F.3d 588, 594 n.5 (5th Cir. 2002) (same); *Barnes v. Johnson*, 160 F.3d 218, 225 (5th Cir. 1998). In *Barnes*, the Fifth Circuit noted that the interrogating officer "was presented with an ambiguous and surprising apparent invocation" and "asked a few explanatory, noncoercive questions" to determine if the suspect intended to invoke the right to remain silent. *Barnes*, 160 F.3d at 225. Further, the Court of Appeals has noted *Barnes*'s reliance on "noncoercive clarifying questions." *Busick v. State*, 906 So. 2d 846, 856 (Miss. Ct. App. 2005) (citing *Barnes*, 160 F.3d at 225).

¶33. Mississippi law is well-established, in cases involving the invocation of the right to counsel, that an interviewing officer may clarify an ambiguous invocation. *Holland*, 587 So. 2d at 856. Today, we extend this same analysis to cases involving the invocation of the right to remain silent.

¶34. As discussed, it is clear that Moore was informed of his right to remain silent. He was also told that anything he said could and would be used against him in a court of law.

¶35. Moore's responses to Detectives Magee and Camel's questions did not invoke his right to remain silent. Moore's responses were ambiguous, and the detectives asked noncoercive, clarifying questions, which revealed that Moore did not intend to invoke his right to silence.

¶36. Detective Magee first asked Moore whether he wanted to give a statement. Moore responded, "No, sir. I ain't, I ain't do nothin'." This statement was ambiguous. While

12

Moore did say, "No, sir," he immediately asserted his innocence to the officers. Moore did not simply say, "No, sir." Instead, he said, "No, sir" and immediately gave a statement proclaiming his innocence to the officers.

¶37. Following up on the ambiguous response from Moore, Detective Magee asked again, "Do you want to give us a statement and tell us?" Moore paused and shook his head negatively in response. The meaning of the head shake, though, within the context of Moore's having just proclaimed his innocence to the detectives, was ambiguous and did not preclude the officers from asking an additional clarifying question.

¶38. Detective Camel sought to further clarify by asking Moore if he wanted to talk at all. Moore stated, "No, sir," followed by "I'll talk to y'all, but . . . ." This statement was again ambiguous. It is actually unclear what exactly Moore stated in response to Detective Camel's questions. There is a possibility that he actually stated, "Yes, sir. I'd talk to y'all but. . . ." This is possible given Moore's different enunciation with the more pronounced "z" sound before the "sir" in comparison to the first "No, sir." Also, Moore could have said any combination of "No, sir" or "Yes, sir" and "I'd" or "I'll." Regardless, in response to Moore's last indication that he would talk, the detectives directed him to sign the waiver form before proceeding with any additional interrogation. Moore did so without hesitation.

¶39. On plain error review, we find that Moore did not invoke his right to remain silent. Moore's statements in response to the detectives were ambiguous. He asserted his innocence followed by a statement that he would talk to the detectives. Also, this entire exchange is bookended by Moore's interaction with the waiver form. At the beginning of the exchange,

13

Moore was reaching for his pen presumably to waive his rights and only stopped because of Detective Magee's further questions. In other words, the series of questions began as an attempt by the detectives to ensure that Moore understood his rights. The interchange did not begin with an invocation—ambiguous or otherwise. Further, at the end of the exchange, Moore voluntarily waived his rights after indicating his willingness to talk. Last, the speed of the exchange supports the conclusion that the detectives' series of questions were not meant to delay but to clarify Moore's intent. Given all this, Moore's responses were not an invocation of his right to remain silent and do not rise to the level of plain error.

¶40.    The dissent maintains that the second portion of Moore's first statement ("I ain't, I ain't do nothin'.") was simply Moore's stated motive for invoking his right to remain silent. Moore, though, proclaimed his innocence, and, by claiming his innocence, Moore began to give a statement to the officers. It is true that, "so long as the suspect's apparent motives do not cast genuine doubt on his desire to stop questioning entirely, then the issue of why he wants to do so is constitutionally irrelevant: the officer must scrupulously honor the suspect's request." *Munson v. State*, 123 P.3d 1042, 1049 (Alaska 2005). Unlike in *Munson*, Moore's motives for invoking his right to silence were not at issue. *Id.* at 1050 ("[T]he state nonetheless maintains that Munson never invoked his constitutional rights because his request was motivated by a fear of Sam Camanga and, thus, equivocal."). Also, the investigator in *Munson* badgered Munson, recapped the evidence against him, played a recording in which Munson acknowledged that he was present for the killing and asked Munson about his decision to remain silent: "So what's the point?" *Id.* at 1049–50. In

14

contrast, the officers' non-threatening response to Moore's ambiguous invocation of his right to remain silent is important: "Do you want to give us a statement and tell us?" The officers did not harass Moore or intimidate him or immediately launch into questioning him.

¶41. The dissent also argues that Moore's clear negative head shake was sufficient to invoke his right to remain silent. *See* ***Chamberlin v. State***, 989 So. 2d 320, 333 (Miss. 2008). First, ***Chamberlin*** was a right-to-counsel case, and the Court simply recapped the facts of the interview. *Id.* The Court's observation that Chamberlin "successfully invoked her right to silence" cannot be extrapolated into a categorical rule that a negative head shake always invokes the right to remain silent. *Id.* Further, Chamberlin's negative head shake was her first and only response when she was asked whether she wanted to speak to law enforcement. *Id.* In addition, the fact that Chamberlin shook her head "no" to invoke her right to remain silent has no bearing on the case before us. In ***Chamberlin***, the officer simply understood that Chamberlin was invoking her right to remain silent. In other words, her negative head shake successfully invoked her right to remain silent because the officer understood her intent and did not need to ask any clarifying questions. Second, the dissent ignores the context of Moore's head shake. Moore had just proclaimed his innocence. Given the context of the head shake, the officers were certainly entitled to ask a further clarifying question.

¶42. Again, our analysis is shaped by our plain-error review of the issue. Had this issue been raised before the trial court, the record would have been more developed. Moore could have testified as to what he had said in response to the detectives' questions and what he had meant by shaking his head. Likewise, the officers could have testified about what they had

15

heard Moore say and how they had understood Moore's responses. Next, the trial court would have weighed the testimony and evidence and would have ruled on the issue. As it appears in the record, though, the evidence does not amount to plain error.

## II. Ineffective Assistance of Counsel

¶43. Moore alleges that his trial counsel provided ineffective assistance of counsel by failing to raise Moore's invocation of the right to remain silent as a ground to suppress his statement. The State responds that Moore's counsel did not provide ineffective assistance. Also, the State argues that the record is inadequate to allow the Court to rule on this issue.

¶44. We have held that

> ineffective-assistance-of-counsel claims are more appropriately brought during post-conviction proceedings. An appellate court is limited to the trial-court record in its review of the claim(s), and there may be instances in which insufficient evidence and/or information exists within the record to address the claim adequately. In such a case, the appropriate procedure is to deny relief, preserving the defendant's right to argue the issue through a petition for post-conviction relief (PCR).

*Dartez v. State*, 177 So. 3d 420, 422–23 (Miss. 2015) (citations omitted). "Issues which may be raised in post-conviction proceedings may also be raised on direct appeal if such issues are based on facts fully apparent from the record." M.R.A.P. 22. On direct appeal, "[t]his Court will rule on the merits on the rare occasions where '(1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge.'" *Wilcher v. State*, 863 So. 2d 776, 825 (Miss. 2003) (quoting *Aguilar v. State*, 847 So. 2d 871, 878 (Miss. Ct. App. 2002)).

¶45. We deny Moore's claim of ineffective assistance of counsel. If he chooses to do so, he may pursue it in a future petition for post-conviction relief. Also, the State maintains that the record is inadequate to rule on the issue. After review, we agree. Moore's purported invocation was ambiguous, and his counsel did move to suppress his statement on two other grounds. Because the record does not affirmatively show ineffectiveness of constitutional dimensions and because the record is inadequate to allow us to make the necessary findings, we deny Moore's claim.

### III. Statutory Right to a Jury for Sentencing

¶46. Moore alleges that the circuit court denied his statutory right to have a jury determine his sentence under Mississippi Code Section 99-19-101(1) (Rev. 2015). The State responds that Section 99-19-101 did not apply to Moore's sentencing because it "is reserved for, and applicable to, a jury's consideration of the imposition of a death sentence." The State contends that Moore was sentenced under Mississippi Code Section 97-3-21(3) (Rev. 2014). Section 99-19-101's effect on the sentencing of a juvenile, capital-murder defendant is an issue of first impression for the Court.

¶47. Our standard for statutory interpretation is well-established:

> The interpretation of a statute is reviewed de novo by this Court. The first question in interpreting a statute is whether the statute is ambiguous. When a statute is unambiguous, this Court applies the plain meaning of the statute and refrains from the use of statutory construction principals. The court may not enlarge or restrict a statute where the meaning of the statute is clear. In interpreting statutes, this Court's primary objective is to employ that interpretation which best suits the legislature's true intent or meaning.

*Gilmer v. State*, 955 So. 2d 829, 833 (Miss. 2007) (citations omitted).

17

¶48. Section 99-19-101(1), in part, provides,

> Upon conviction or adjudication of guilt of a defendant of capital murder or other capital offense, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death, life imprisonment without eligibility for parole, or life imprisonment. The proceeding shall be conducted by the trial judge before the trial jury as soon as practicable. If, through impossibility or inability, the trial jury is unable to reconvene for a hearing on the issue of penalty, having determined the guilt of the accused, the trial judge may summon a jury to determine the issue of the imposition of the penalty. If the trial jury has been waived, or if the defendant pleaded guilty, the sentencing proceeding shall be conducted before a jury impaneled for that purpose or may be conducted before the trial judge sitting without a jury if both the State of Mississippi and the defendant agree thereto in writing.

Miss. Code. Ann. § 99-19-101(1). Section 97-3-21(3) declares, "Every person who shall be convicted of capital murder shall be sentenced (a) to death; (b) to imprisonment for life in the State Penitentiary without parole; or (c) to imprisonment for life in the State Penitentiary with eligibility for parole as provided in Section 47-7-3(1)(f)." Miss. Code. Ann. § 97-3-21(3). Mississippi Code Section 47-7-3 (Supp. 2018) renders Moore ineligible for parole. Miss. Code Ann. § 47-7-3(1)(d)–(e) (Supp. 2018).

¶49. Further, "[t]he Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed." *Roper v. Simmons*, 543 U.S. 551, 578, 125 S. Ct. 1183, 1200, 161 L. Ed. 2d 1 (2005). Also, "mandatory life-without-parole sentences for juveniles violate the Eighth Amendment," and *Miller* requires a sentencing hearing for juvenile capital offenders. *Miller v. Alabama*, 567 U.S. 460, 470, 132 S. Ct. 2455, 2464, 183 L. Ed. 2d 407 (2012); *see Parker v. State*, 119 So. 3d 987, 995–99 (Miss. 2013); *Jones v. State*, 122 So. 3d 698, 700–03 (Miss. 2013);

18

*Chandler v. State*, 242 So. 3d 65, 68–70 (Miss. 2018). Thus, Moore could have been sentenced to life imprisonment without parole or life imprisonment with parole under *Miller*. Now, the Court must determine the proper sentencing authority for a juvenile, capital-murder defendant under Section 99-19-101, post-*Miller*. This issue is one of first impression for the Court.

¶50. Section 99-19-101 is unambiguous. It provides that when a defendant is convicted of capital murder, the trial court must conduct a separate proceeding to determine the defendant's sentence. The separate proceeding is to be held before the trial jury. The jury is to determine if the defendant is to be sentenced to death, life imprisonment without parole or life imprisonment.

¶51. Section 99-19-101 uses mandatory language requiring that a separate sentencing hearing *shall* take place"[u]pon conviction or adjudication of guilt of a defendant of capital murder . . . before the trial jury as soon as practicable." Miss. Code Ann. § 99-19-101(1). Mandatory language in a statute leaves the circuit court no discretion in sentencing. "When used in a statute, the word 'shall' is mandatory and the word 'may' is discretionary." *D.D.B. v. Jackson Cty. Youth Court*, 816 So. 2d 380, 382 (Miss. 2002) (citing *Murphy v. State*, 253 Miss. 644, 649, 178 So. 2d 692, 693 (1965)).

¶52. The State argues that Section 99-19-101 is only applicable to a jury's imposition of a death sentence because Moore was sentenced under Section 97-3-21. Section 97-3-21, though, is not a separate sentencing scheme from Section 99-19-101. Section 97-3-21 details the punishment for capital murder, but every capital-murder sentence is subject to Section

19

99-19-101, given its unambiguous language.

¶53.    "The entire statute must be construed together, and effect given to every part, if it can be done without manifestly violating the intent of the legislature. A construction which will render any part of a statute inoperative, superfluous, or meaningless is to be avoided." **State ex rel. Pair v. Burroughs**, 487 So. 2d 220, 226 (Miss. 1986) (quoting **McCaffrey's Food Mkt., Inc. v. Miss. Milk Comm'n**, 227 So. 2d 459, 463 (Miss. 1969). While Section 99-19-101 does govern the jury's imposition of the death penalty, its language encompasses every capital offense without exception. The Legislature delegated the sentencing authority for all capital offenses to the jury, unless a jury sentencing is waived. Thus, Section 99-19-101 applies to every capital-murder offense, but not every provision of Section 99-19-101 applies to the jury's consideration in every case (for instance, when the death penalty is barred for juvenile offenders).

¶54.    As the question before us is one of first impression, we have no precedent interpreting Section 99-19-101's application to a juvenile convicted of capital murder. A panel of the Court, though, did conclude that a juvenile, capital-murder defendant was entitled to a **Miller** hearing before a jury under Section 99-19-101. Order, **Dycus v. State**, No. 2012-M-02041 (Miss. Sept. 17, 2004).[4] A jury had convicted Dycus of capital murder and sentenced him to death. **Dycus v. State**, 910 So. 2d 1100, 1101 (Miss. 2005). Following **Roper**, the Court had vacated Dycus's death sentence and had remanded the case for Dycus to be resentenced "to life imprisonment . . . without the possibility of parole." **Id.** After **Miller**, Dycus filed

_____

[4] The **Dycus** panel was comprised of then-Presiding Justice Randolph and former Justices Pierce and Chandler. Justice Chandler signed the order.

20

an Application for Leave to Proceed in the Trial Court, and a panel of the Court vacated Dycus's sentence and remanded for a sentencing hearing before a jury under Section 99-19-101. Order, *Dycus*, No. 2012-M-02041, at *2.

¶55. Also, our decision in *Pham v. State* authorizes a common practice among trial courts of sentencing a defendant in a capital case after a jury trial in which the death penalty is not sought despite the contrary language found in Section 99-19-101. *Pham v. State*, 716 So. 2d 1100, 1103–04 (Miss. 1998). This authority, however, is vested in the trial court, because the parole statutes leave only one sentencing option. *Pham*, 716 So. 2d at 1103–04. In the sentencing of a juvenile, capital-murder offender, though, more than one sentence is possible due to *Miller*.

¶56. In *Pham*, a jury convicted Pham of capital murder. *Id.* at 1101. The State did not seek the death penalty. *Id.* at 1103. Thus, the circuit court declined to have the jury sentence Pham, since life imprisonment without parole was the only sentence available given Section 47-7-3's limits on parole. *Id.* at 1103–04. On appeal, the Court affirmed, holding that

> there was only one sentence which Pham could receive upon a valid conviction of capital murder under the facts of this case[.] Pham's right to due process was not violated by the trial judge cutting out the extra, but meaningless, procedural step. To hold otherwise would elevate form over function.

*Id.* at 1104.

¶57. In resolving this issue, we acknowledge that the Court of Appeals has dealt with sentencing issues under Section 99-19-101 after *Miller*. *Cook v. State*, 242 So. 3d 865, 876 (Miss. Ct. App. 2017); *Wharton v. State*, No. 2017-CA-00441-COA, 2018 WL 4708220, at *6 (Miss. Ct. App. Oct. 2, 2018), *petition for cert. filed* (Miss. Apr. 8, 2019); *McGilberry v.*

21

*State*, No. 2017-KA-00716-COA, 2019 WL 192345, at \*3 (Miss. Ct. App. Jan. 15, 2019) These decisions, though, dealt with scenarios in which defendants sought *resentencing* by a jury post-*Miller* (similar to the *Dycus* panel order). In contrast, Moore seeks his *initial sentencing* by a jury under Section 99-19-101, which the circuit court denied. In other words, our holding today is limited to the facts of this case: a minor convicted of capital murder post-*Miller* who was denied sentencing by a jury.

¶58.    After review, we conclude that Moore was entitled to be sentenced by a jury. Section 99-19-101(1) provides that, "[u]pon conviction or adjudication of guilt of a defendant of capital murder or other capital offense, the court shall conduct a separate sentencing proceeding . . . before the trial jury as soon as practicable." Miss. Code Ann. § 99-19-101(1). This plain language requires all capital offenders—without exception—to be sentenced by a jury. This interpretation also finds support in the *Pham* Court's reasoning. The *Pham* Court affirmed the circuit court on the grounds that life imprisonment without parole was the only available sentence, but it did not hold that Section 99-19-101 only applied to cases in which the death penalty was sought. *Pham*, 716 So. 2d at 1104.

¶59.    Here, the circuit court erred when it denied Moore's request to have a jury sentence him. Moore—a juvenile—was convicted of capital murder post-*Miller* but was denied his request for a jury sentencing. We vacate Moore's sentence and remand the case for resentencing before a jury. The jury will be tasked with determining whether Moore should be sentenced to life imprisonment without parole or life imprisonment with eligibility for parole. If the jury determines that Moore should be eligible for parole, the trial court shall

22

sentence Moore to life imprisonment with eligibility for parole, notwithstanding the provisions of Mississippi Code Section 47-7-3(1)(e).

### IV.    Denial of the Motion for Funds

¶60.    Last, we address the trial court's denial of Moore's motion for funds for expert assistance in the field of mitigation investigation.  The question of whether a defendant has a right to funds is a question left to the sound discretion of the trial court.  *See Ruffin v. State*, 447 So. 2d 113, 118 (Miss. 1984); *Johnson v. State*, 476 So. 2d 1195, 1202 (Miss. 1985).  In fact,

> This Court weighs on a case by case basis whether the denial of expert assistance for an accused is prejudicial to the assurance of a fair trial and will grant relief only where the accused demonstrates that the trial court's abuse of discretion is so egregious as to deny him due process and where his trial was thereby rendered fundamentally unfair.

*Harrison v. State*, 635 So. 2d 894, 901 (Miss. 1994) (quoting *Johnson v. State*, 529 So. 2d 577, 590 (Miss. 1988)).  "[T]he Constitution does not require a State to furnish an indigent defendant with expert or investigative assistance upon demand."  *Johnson*, 476 So. 2d at 1202.  "[A] defendant must come forth with concrete reasons, not unsubstantiated assertions that assistance would be beneficial."  *Harrison*, 635 So. 2d at 901.

¶61.    After review of the record, we conclude that the trial court did not abuse its discretion in denying Moore's motion.  We have never held that expert testimony is required in a *Miller* hearing.  *Chandler*, 242 So. 3d at 67–71; *Jones*, 122 So. 3d at 699–703; *Parker*, 119 So. 3d at 989–91, 995–1001.  The determination of an offender's potential for rehabilitation under the *Miller* factors is left to the sentencing authority.  *Chandler*, 242 So. 3d at 68–71; *Jones*,

122 So. 3d at 700–03; *Parker*, 119 So. 3d at 995–1001. This is not to say that a specific case may not arise in which expert testimony could be helpful and could be allowed. While the trial court did not err in denying Moore's motion for funds, Moore—given his resentencing before a jury—may seek funds on remand should his counsel determine that an expert witness is warranted. If Moore does request funds, the trial court, of course, will still need to determine if Moore is entitled to them.

## CONCLUSION

¶62. We affirm Moore's conviction of capital murder. Further, we vacate Moore's sentence of life imprisonment without parole and remand to the trial court for Moore to be resentenced by a jury under Mississippi Code Section 99-19-101. The jury will determine if Moore should be sentenced to life imprisonment without parole or life imprisonment with eligibility for parole. If the jury determines that Moore should be eligible for parole, Moore is to be sentenced to life imprisonment with eligibility for parole, notwithstanding the provisions of Mississippi Code Section 47-7-3(1)(e).

¶63. **AFFIRMED IN PART; VACATED AND REMANDED IN PART.**

**RANDOLPH, C.J., COLEMAN, MAXWELL, BEAM AND GRIFFIS, JJ., CONCUR. KING, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, P.J., AND ISHEE, J.**

**KING, PRESIDING JUSTICE, DISSENTING:**

¶64. It was plain error to admit Moore's statement to police into evidence because the statement was given after he invoked his right to remain silent. Moore's conviction should be reversed and the case should be remanded for a new trial; accordingly, I respectfully

24

dissent.[5]

¶65. The video of Moore's statement, introduced at the suppression hearing, showed that Detectives Magee and Camel interviewed Moore and had him sign a waiver of his *Miranda*[6] rights. Yet, this waiver of rights was not signed as witnessed by either Magee or Camel. Instead, it was witnessed by Detective Owens, who never appeared in the video, but who was the lead detective on the case. During the suppression hearing, it was made clear that it was not normal procedure for pre-signed waiver forms to be used, nor was it normal procedure for a detective not interviewing the witness to sign a waiver form.

¶66. On the video, when asked if he wanted to give a statement, Moore initially responded, "No, sir. I ain't, I ain't do nothing." The detectives again asked him if he wanted to give a statement. Moore unambiguously and unequivocally shook his head in the negative. The detectives again asked Moore if he wanted to talk to them, and Moore replied, "No, sir. I [indecipherable] talk to y'all, but . . . ." At that point, one of the detectives interrupted Moore and stated, "Ok. Sign. Sign right here." Moore then said something indecipherable and both detectives forcefully responded, "Sign your name." The detectives then extensively questioned Moore.

¶67. What occurred before the initiation of the video, namely whether Detective Owens attempted to interview Moore first, hence his signature on the waiver form despite not

---

[5]While I agree with the majority's conclusion regarding the sentencing issue, that issue would be moot were Moore's conviction reversed and the case remanded for a new trial.

[6]*Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

actually witnessing the waiver, is disputed. Detective Camel testified that he and Detective Magee interviewed Moore because when Moore was brought in, the detectives who "first started initially trying to talk to him . . . could not get anywhere with him. And he wouldn't talk to them." So Detectives Camel and Magee were "asked to go in and try to talk to him, see if we could get him to talk." He reaffirmed multiple times in his testimony that other detectives had questioned Moore first and that Moore would not talk with them. ("Q. You stated that there were other detectives that were talking to Mr. Moore prior to you and Mr. Magee questioning him? A. Yes. Q. Where they had been in that same interview room? A. Prior to us. Q. They were? A. Prior to us.") ("Q. Well you said other people tried to talk to him? A. That's correct. What I'm saying, they tried to talk to him but there was no communication between them. Q. Okay. A. Wasn't nothing said.") ("Like I said, you know, (inaudible) and Ella started off the interview. And I can't explain why we didn't sign.") ("Q. Is it possible that Detective Owens or Detective Thomas could have been watching through the two-way mirror as you and Detective Magee questioned him? A. I know they were, yes. Q. You know that happened? A. Yes."). Detective Magee, on the other hand, at first testified that no one else interviewed Moore, then backtracked and testified several times that he "can't answer" whether someone else interviewed Moore before he and Detective Camel did.[7] Detectives Owens and Thomas both testified that they did not interview Moore.

¶68.    On cross-examination, Detective Owens admitted that he had interviewed one of the

_____

[7]Tellingly, at trial, Detective Magee was asked whether Moore had ever indicated that he did not want to speak to police, and Detective Magee said that Moore never indicated that he did not want to speak. This is starkly contradicted by the video, in which Moore stated several times that he did not want to speak to police.

26

other suspects in the case. When defense counsel pointed out that no report of this interview existed and that another detective testified that he had interviewed that suspect, Owens then stated that "according to [his] records," he did not interview that suspect. Defense counsel tried to establish that Owens had signed a waiver form for that suspect as well, but the trial court limited cross-examination on that issue; thus Moore was unable to fully flesh out the meanings of the highly unusual procedure surrounding his statement.

¶69. The "invocation of the right to silence concerns whether an officer scrupulously honors a defendant's right to cease questioning for a reasonable time, after which questioning may resume if the defendant knowingly and voluntarily waives this right." *Chamberlin v. State*, 989 So. 2d 320, 334 (Miss. 2008). "No magic language must be used by an accused wishing to invoke his right to stop the interrogation." *Jones v. State*, 461 So. 2d 686, 699 (Miss. 1984). "[A] suspect need not 'speak with the discrimination of an Oxford don' . . . ." *Davis v. United States*, 512 U.S. 452, 459, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994) (quoting *Davis*, 512 U.S. at 476 (Souter, J., concurring in judgment)). When a defendant invokes the right to silence, the interrogation must cease. *Holland v. State*, 587 So. 2d 848, 855 (Miss. 1991). However, an interrogator may ask questions to clarify ambiguous invocations. *Id.* at 856. Such an inquiry is "strictly limited" to "clarification purposes." *Id.* "[A]n interrogator's 'behavior' must not exceed the limits of permissible clarification." *Id.* at 858. Thus, once any ambiguous invocation is clarified, there is no need for further clarifying questions. *See Michigan v. Mosley*, 423 U.S. 96, 105-06, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975) (negatively distinguishing the situation in which interrogators "persist[] in

27

repeated efforts to wear down [the defendant's] resistance and make him change his mind.").

¶70.  At the outset, Moore unambiguously invoked his right to remain silent by stating that he did not want to speak with the officers because he did not do anything.  The majority construes the statement "No, sir.  I ain't, I ain't do nothing[]" as ambiguous, because Moore stated his reasoning for invoking his right to silence after his clear, unambiguous, and unequivocal statement that "No, sir" he did not want to speak with police.  Moore stating his reason for invoking his right to silence in no way undermines his unambiguous invocation of that right.  "[S]o long as the suspect's apparent motives do not cast genuine doubt on his desire to stop questioning entirely, then the issue of why he wants to do so is constitutionally irrelevant: the officer must scrupulously honor the suspect's request." *Munson v. State*, 123 P.3d 1042, 1049 (Alaska 2005).  The majority claims that prior to this statement, Moore was "reaching for his pen" and then out of whole cloth "presum[es]" that its characterization of his movement was because Moore was going to waive his rights.  Maj. Op. ¶ 39.  Yet, the movement that the majority characterizes as "reaching for his pen" is Moore placing both his hands on the edge of the table at the same time.  In no way is Moore obviously reaching for his pen or anything else.  Describing his action as "reaching for his pen" requires much more guesswork and many more assumptions than the majority indicates.  And this characterization is what the majority believes "bookend[s]" Moore's statements.  Maj. Op. ¶ 39.

¶71.  Moreover, even assuming for the purpose of argument that Moore's first invocation of his right to silence was ambiguous, as the majority concludes, his second invocation of the

28

right to silence was certainly unambiguous and unequivocal. When the officer asked a "clarifying" question about whether Moore wanted to speak with them, Moore unambiguously shook his head "no." A clear negative head shake, such as the one employed by Moore to invoke his right to silence, is a sufficient and clear invocation.[8] *See Chamberlin*, 989 So. 2d at 333 (a head shake "no" in response to whether she was willing to answer questions was a successful invocation of her right to silence). After Moore's unambiguous and unequivocal invocation of his right to silence, any ambiguity was clarified, and the officers had no basis to ask further clarifying questions.[9] The majority inexplicably finds this unambiguous invocation in response to a clarifying question to be ambiguous, without adequately explaining how "no" is remotely ambiguous. An officer is not allowed to continue to ask "clarifying" questions until he or she receives the response she wants— the questioning must end once the invocation is clarified. Any further questioning exceeds

---

[8]Ambiguities often tend to occur when invocations are in the form of a question or use the word "maybe," as contrasts with Moore's unambiguous repetition of the word "no." *See Holland*, 587 So. 2d 848 (defendant asked a question about an attorney); *Davis*, 512 U.S. 452 (defendant used the equivocal word "maybe"); *Gillett v. State*, 56 So. 3d 469 (Miss. 2010) (defendant used the word "maybe").

[9]A head shake in the negative is universally understood as "no." The majority's argument that it is ambiguous "in context" logically must include a situation in which a defendant such as Moore verbally answered "no." Thus, if Moore had verbally stated "no" to the second "clarifying" question, the majority would still deem that "ambiguous" "in context." Such an argument stretches credulity. "No" is not ambiguous.

Moreover, taken to its logical conclusion, a holding that a clearly negative head shake is "ambiguous" in its meaning could affect many of our cases. This Court frequently relies on records in which the court reporter's transcript indicates that head movement is either positive or negative. According to the majority, this Court can no longer justify reliance on those notations, and attorneys should note that any such evidence in the record is now deemed "ambiguous."

29

the limits of permissible clarification, and appears to be an effort to pressure Moore, or to "persist[] in repeated efforts to wear down [the defendant's] resistance and make him change his mind." *Mosley*, 423 U.S. at 105-06.

¶72. While Moore's third invocation of his right to silence need not be analyzed as it was subsequent to his unambiguous invocation of the right, the majority finds that invocation to be ambiguous, as well. Yet, Moore again said "no," he did not want to speak to police. He then stated, "I [indecipherable] talk to y'all, but . . . ." and the police officers pounced on him, interrupting his answer and instructing him to sign the waiver. Had Moore been allowed to complete his answer, perhaps his statement would be less "ambiguous." As it stands, the officers did not allow Moore to complete his answer and to clarify it. The State cannot *create* the ambiguity and then reap the benefit of that ambiguity; here, the officers created any ambiguity by refusing to let Moore finish his "clarifying" answer.

¶73. The failure to cease interrogation after Moore's invocation of his right to silence is made all the more troubling by the potential that Moore was interviewed by other officers first and refused to talk to them. The State admitted at the suppression hearing that it is unknown what, if anything, occurred in that first interview. The conflicts in the testimony of the various detectives are striking—while Detective Owens testified that he did not interview Moore, Detective Camel testified repeatedly and with certainty that Detective Owens had indeed attempted to interview Moore, but that the interview had been unsuccessful. Detective Camel's testimony is bolstered by Detective Owen's signature on Moore's waiver of rights, despite a pre-signed waiver of rights having no place in police

30

protocol. The testimony that Moore would not speak to the first detectives strongly implies that he may have invoked his right to silence during any first interview. The State, however, argued at the suppression hearing that the first interview was unimportant because "if there had been a first interview, well Detective Magee and Detective Camel went back through his Miranda rights." Yet, had there been a first invocation of the right to remain silent, the interrogators must give a cooling-off period by waiting a reasonable amount of time before re-initiating questioning. The facts give no indication that any cooling-off period occurred.[10]

¶74.    Because Moore invoked his Fifth Amendment right to remain silent prior to giving his statement to police, his statement was inadmissible as evidence against him, and the admission of the statement was plain error. Given that a substantial amount of the direct evidence against Moore came from his statement to the officers, such error is not harmless and results in a manifest injustice. Consequently, I would reverse Moore's conviction and remand the case for a new trial.

    **KITCHENS, P.J., AND ISHEE, J., JOIN THIS OPINION.**

---

[10]While this issue is reviewed for plain error, it is noteworthy that, had this been raised with the trial court, the State would have had the burden of proof to show that Moore's statement was admissible. *Chamberlin*, 989 So. 2d at 332 ("The State has the burden of proving all facts prerequisite to admissibility beyond a reasonable doubt."). On the record before this Court, it is clear that the State did not, and could not, prove admissibility beyond a reasonable doubt.